**William L. BEY**

v.

**William F. BOLGER, Postmaster General of the United States, United States Postal Service Merit Systems Protection Board.**

**Civ. A. No. 80–1840.**

United States District Court, E. D. Pennsylvania.

April 20, 1982.

Alan L. Phillips, Philadelphia, Pa., for plaintiff.

Bruce Joel Jacobsohn, Senior Asst. Regional Labor Counsel, U. S. Postal Service, Philadelphia, Pa., for defendant.

## MEMORANDUM AND ORDER

BECHTLE, District Judge.

In this action, plaintiff William L. Bey ("Bey") seeks to reverse the decision of the Merit Systems Protection Board ("MSPB") which affirmed the decision of the United States Postal Service ("Postal Service") to deny for medical reasons plaintiff's applica-tion for reinstatement following Bey's com-pletion of a two year enlistment with the United States Navy. In addition, plaintiff Bey claims that the Postal Service's action violated the Rehabilitation Act of 1973, as amended, 29 U.S.C. § 791. The parties have filed cross-motions for summary judg-ment on Bey's challenge to the decision of the MSPB, and a non-jury trial was held on August 20, 21 and 31, 1981, on Bey's claim of employment discrimination.

The Court will now rule on the cross-mo-tions for summary judgment and present its findings of fact and conclusions of law with respect to the Rehabilitation Act discrimi-nation claim.

### I. Merit Systems Protection Board Claim

#### A. Facts

Plaintiff worked as a Distribution Clerk with the Postal Service from November 12, 1973 to February 8, 1976. On February 9, 1976, plaintiff enlisted in the United States Navy. On February 20, 1978, plaintiff was separated from the Navy and transferred to the temporary disability retired list. DD Form 214N (R. 139). On March 28, 1978, plaintiff applied for re-employment with the Postal Service, seeking reinstatement to his former position as a Distribution Clerk, Level 5, in Philadelphia, Pennsylvania. On March 29, 1978, plaintiff was examined by Irvin F. Hermann, then Area Medical Offi-cer for the Postal Service, and the following blood pressure readings were obtained: 180/120, 170/115 (upright) and 165/115, 180/115 (reclining). Certificate of Medical Examination (March 29, 1978) (R. 128–131). Dr. Hermann noted the following medical history:

"Worked as clerk 1973–76. Navy 1976–78. 1976-Dec.—swelling of hands, elevat-ed B.P. detected (while in service) in Portsmouth Hosp. Dec. 1976-Jan. 1977—3 weeks. Discharged from Navy Feb. 1978 because of hypertension and cold urtica-ria. Getting 30% disability."

(R. 129). On April 18, 1978, Dr. Hermann re-examined the plaintiff and obtained the following blood pressure readings: 160/100, 160/100 (sitting) and 160/100, 160/100 (ly-

ing). (R. 129). Based on the medical history obtained from plaintiff and the blood pressure readings obtained on March 29 and April 18, 1978, Dr. Hermann recommended that plaintiff not be reinstated to employment because of "elevated B.P. [blood pressure] . . . has been treated for more than one year . . . not controlled." (R. 131). Dr. Hermann noted on a separate slip of paper that "[t]his man does not qualify and should reapply at a later date after adequate treatment." (R. 130). Plaintiff was again reexamined by the medical staff on three separate occasions. Certificate of Medical Examination (June 29, 1978) (R. 124–126). On May 3, 1978, plaintiff's blood pressure was recorded at 165/110; on June 8, 1978, it was 170/110, 180/120, 168/110; and on June 29, 1978, it was recorded at 168/118, 174/115. (R. 125). It was noted on the examination sheet that plaintiff was "on inderal, hydrodiural and apresoline daily for hypertension approx. 1 year from Phila. V. A. [Philadelphia Veterans Administration]" and that plaintiff was on a "30% vet. disability." On June 29, 1978, it was determined that plaintiff was "unsuitable" because of his hypertensive condition and the doctor's recommendation was adopted by Dominic J. Scola, an employment officer for the Postal Service. (R. 126). On July 5, 1978, plaintiff was notified by letter by A. E. Duncanson, Postmaster, Philadelphia District, that his request for re-employment-military had been denied.

On July 14, 1978, plaintiff filed an appeal with the United States Civil Service Commission, Federal Employee Appeals Authority ("FEAA") (predecessor agency to MSPB) on the grounds that the Postal Service had violated his rights to re-employment under Section 9 of the Military Selective Service Act of 1967, as amended, 50 U.S.C.A.App. § 459 and 38 U.S.C. § 2021 *et seq.* and the applicable regulations found at 5 C.F.R. Part 353. On November 3, 1978, the FEAA reversed the agency action because the Postal Service had failed to consider plaintiff for positions other than his former position as a Level 5 distribution clerk for which he may be qualified despite his disability. Decision of FEAA (November 3, 1978) (R. 114–118). The FEAA noted:

We must find that the record clearly establishes that the appellant was not physically qualified for restoration to that position [Distribution Clerk] as of July 5, 1978, when the decision was made by the agency to deny his application for same. The record does not establish, however, that the appellant was physically disqualified for restoration under the criteria set forth in FPM, Chapter 353, Appendix B–4 to positions as set forth in 5 CFR 353.303 and 304. The medical evidence of record does not specifically address all of the position possibilities, *agency-wide*, to which the appellant was entitled to be considered for restoration as set forth above; nor does the agency otherwise address other position possibilities, other than *light duty positions*, even though specifically referred to 5 CFR 353.304 in our letter of October 16, 1978.

(R. 116).[1] Therefore, the FEAA stated:

It is the decision of the Federal Employee Appeals Authority that the agency action is reversed. It is recommended that the agency restore the appellant to a position for which he qualifies after having again been medically examined and having had the criteria set forth in the FPM, Chapter 353, Appendix B–4 applied to all positions for which he is entitled to be considered pursuant to 5 CFR 353.303 and 304. This decision constitutes the agency's authority to take such recommended corrective action. Should such recommended cor-

---

1. Plaintiff also argued that even if it were found that plaintiff was disqualified from full duty, he should have been considered for light duty assignments believed to be available. However, Article XIII of the Collective Bargaining Agreement between the Postal Service and its employees required a minimum of five years service before consideration can be made for light duty status. Plaintiff had been first ap-

pointed to the Postal Service on November 12, 1973. Therefore, plaintiff did not have the required amount of time for consideration for light duty status even counting the time served in the military. Nevertheless, the FEAA did not address this question in view of the fact that the case was remanded for consideration for other employment opportunities.

rective action result in the appellant being restored to employment, such restoration must be retroactive to the time frame prescribed by 5 CFR 353.302. Should such recommended corrective action result in a new determination that the appellant is medically disqualified for restoration, such new determination will be subject to a new appeal.

(R. 117).

Pursuant to the FEAA's remand, Bruce Dixon, Manager, Labor Relations, wrote to plaintiff on November 13, 1978, and requested "a complete medical file to include the following medical information:

1) history of your physical condition/hypertension

2) results of a current physical examination

3) results and conclusions of any and all pertinent studies

4) prognosis relative to your hypertensive condition

5) any and all limitations (to include duration of each) emanating from your hypertensive state."

Letter from Dixon to Bey (November 13, 1978) (R. 110–111). On December 5, 1978, the Postal Service received the medical reports of plaintiff's treating physicians—the Veteran's Administration Outpatient Clinic ("V. A. Clinic")—which included progress notes of physical examinations from May through November, 1978, x-rays of plaintiff's heart taken on June 5, 1978, and a report of the electrocardiogram taken of plaintiff on June 18, 1978. (V.A. File No. 209 40 1371) (R. 77–90). These records re-

vealed that plaintiff's "heart shows moderate enlargement to the left" (R. 84) and that high blood pressure readings were obtained from plaintiff during examinations with the V. A. Outpatient Clinic. (R. 85–89).[2]

On December 6, 1978, Dr. Hermann wrote to the Personnel Office:

A review of the current information available indicates that the above named [Bey] has hypertensive cardiovascular disease with cardiac enlargement, abnormal EKG and poorly controlled blood pressure levels.

It is my opinion that he does not meet the requirements for any position in the Postal Service.

Letter from Hermann to Personnel (Dec. 6, 1978) (R. 91). On December 28, 1978, Dixon advised plaintiff that:

After receipt (on December 5, 1978) of medical reports from your treating physician(s) (of the VA Outpatient Clinic) a review of two postal medical officers concluded that at this time you are physically unfit for any employment due to your continuing uncontrolled blood pressure, your cardiac enlargement and your abnormal EKG which evidenced left sided strain of the heart.

Our records indicate that subsequent to your March 28, 1978 application for reemployment, you were examined on five different occasions—March 29, April 18, May 3, June 8 and June 29, 1978—each time of which resulted in the same finding of uncontrolled elevated blood pressure. Records also disclose your claim

2. The following blood pressure readings were taken from plaintiff and are contained in the records:

| DATE | PLACE | BLOOD PRESSURE READING |
|------|-------|------------------------|
| 1978 | | |
| February 24 | Navy, Virginia | 160/110 |
| March 31 | Navy, Virginia | 132/96 |
| April 3 | Navy, Virginia | 158/86 |
| April 7 | Navy, Virginia | 154/98 |
| May 17 | VA Clinic | 170/115 170/118 180/115 |
| May 19 | VA Clinic | 150/90 |

| DATE | PLACE | BLOOD PRESSURE READING |
|------|-------|------------------------|
| 1978 | | |
| May 22 | VA Clinic | 150/90 |
| May 25 | VA Clinic | 150/110 |
| May 26 | Navy, Philadelphia | 130/96 |
| May 30 | Navy, Philadelphia | 152/100 |
| June 2 | Navy, Philadelphia | 146/98 |
| June 2 | VA Clinic | 150/100, 140/95 140/95 |
| June 12 | VA Clinic | 130/80 |
| July 18 | VA Clinic | 180/100 |
| August 11 | VA Clinic | 140/90 |

that you were then under treatment for this condition. However, review by postal physicians of recent VA medical reports reflect no improvement of your physical condition.

Therefore, we regret to advise you that your request for re-employment-military must be disapproved since you physically disqualify as a result of failing to meet the physical employment standards for any position in the postal service.

Letter from Dixon to Bey (Dec. 28, 1978) (R. 57).

On January 8, 1979, plaintiff appealed the Postal Service's decision to the MSPB (successor to the FEAA, effective January 1, 1979). On March 21, 1979, MSPB affirmed the Postal Service's action. Decision of MSPB (March 21, 1979) (R. 60–64). The MSPB stated:

> Part 353 of the Civil Service Regulations concerning an agency's obligation to restore, essentially provides that an employee of an agency who enters on military duty, is entitled to restoration following his release from military duty. Part 353.304 of the Civil Service Regulations provides, in pertinent part:
>
>> A returning employee who, because of a disability sustained during military duty, is disqualified for a position to which he has restoration rights, is entitled to be restored to another position in the agency for which he is qualified that will provide him like seniority, status and pay, or the nearest approximation thereof consistent with the circumstances in his case.
>
> However, we have reviewed the medical evidence furnished by the agency and conclude that the agency's determination that the appellant was medically unsuitable for any agency position is a valid one, based on the appellant's diagnosed physical condition.

> * * * * *

> Based on the foregoing, it is concluded that the appellant is shown not qualified for restoration after military duty to the position he held before entering on active military duty or to other like positions. Further, it is concluded that the appellant's condition effectively precluded the agency from otherwise restoring the appellant to any other available position to which he might otherwise have been entitled.

(R. 62–63). On May 13, 1980, plaintiff filed this lawsuit in the United States District Court.[3]

## B. Discussion

■ Plaintiff now contends that the Postal Service failed to meet its burden of showing that the plaintiff was not qualified for any position in the Postal Service due to medical reasons and that the decision of the MSPB in upholding the Postal Service determination was arbitrary and capricious and an abuse of discretion in violation of Section 706(2)(A) of the Administrative Procedure Act, 5 U.S.C. § 706(2)(A).[4] Under Section 9 of the Military Selective Service Act of 1967, as amended, 50 U.S.C.A. App. § 459, and 38 U.S.C. § 2021 *et seq.*, a person who enlisted in the armed forces is entitled to be restored to his former employment or to another job with like seniority, status and pay if he applies for the position within ninety days after satisfactory completion of his military duty and if he is still qualified to perform the duties of the

---

3. Jurisdiction for review of this agency decision is found at 39 U.S.C. § 409(a).

4. The judicial review of an agency's personnel actions, as well as FEAA decisions, is limited to review of the administrative record. *Polcover v. Secretary of the Treasury*, 477 F.2d 1223, 1226 -27 (D.C.Cir.), *cert. denied*, 414 U.S. 1001, 94 S.Ct. 356, 38 L.Ed.2d 237 (1973). The standard of review is whether the agency committed procedural or substantive error, or if the agency action was arbitrary or capricious. *Alsbury v. U. S. Postal Service*, 530 F.2d 852,

854 (9th Cir.), *cert. denied*, 429 U.S. 828, 97 S.Ct. 85, 50 L.Ed.2d 91 (1976). An agency decision will not be found to have been arbitrary or capricious if substantial evidence appears on the record to support the agency's determination. Substantial evidence is "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Richardson v. Perales*, 402 U.S. 389, 401, 91 S.Ct. 1420, 1427, 28 L.Ed.2d 842 (1971). *See also Lewis v. Califano*, 616 F.2d 73 (3d Cir. 1980).

job. If he is no longer qualified to perform the duties of his former position by virtue of a disability sustained during his military service, he is entitled to be restored by that employer to another position for which he is qualified that will provide him with like seniority, status and pay comparable to his original position under all of the circumstances of the case. 38 U.S.C. § 2021(a)(A)(i) and (ii). Pursuant to the Federal Personnel Manual, Chapter 353, Appendix B (B–4) (October 1975), a federal agency "should not refuse to restore an employee because of physical disability unless the disability would:

—Make duty performance impossible;
—Reduce job efficiency below the level normally expected of an acceptable employee;
—Cause the employee's presence on the job to jeopardize the safety or health of the employee or others; or
—Be a basis for separation or disability retirement.

▮▮▮ In this case, there is substantial evidence to support the Postal Service's findings that the plaintiff was not qualified for any position in the Postal Service because of his hypertension disability. The Court can take judicial notice that a person suffering hypertension is susceptible to stroke, heart attack, or other physical ailments. There is substantial evidence in the record to support the Postal Service's decision and the affirmance of that decision by the MSPB that plaintiff was medically unqualified for any position in the Postal Service. On four separate occasions, April 18, May 3, June 8 and June 29, 1978, plaintiff was examined by Postal Service physicians and found to suffer from hypertension. Plaintiff's blood pressure readings were taken in the standing and lying positions and repeated at different time intervals during the examinations. V. A. Outpatient records confirmed the Postal Service's determination that plaintiff suffered from uncontrolled hypertension and hypertensive cardiovascular disease. A V. A. x-ray taken on June 5, 1978, revealed that plaintiff's heart "shows moderate enlargement to the left." Moreover, the electrocardiograms

submitted were indicative of the aforementioned ailments.

Plaintiff yet argues that the Postal Service failed to show that this disability would (1) make duty performance impossible; (2) reduce job efficiency below accepted levels; (3) present a "high probability" of hazard to himself or others; or (4) be a basis for separation or disability retirement. The Court finds, however, that there is substantial evidence to support this finding. The medical evidence submitted to and obtained by the Postal Service readily revealed that plaintiff was suffering from uncontrolled hypertension and hypertensive cardiovascular disease from February to December, 1978. This condition is unusual for a man who was twenty-five years old at the time of the application. It was reasonable for the Postal Service to conclude that plaintiff's disability presented a "high probability" of hazard to himself and that the danger would only be increased by strenuous physical activity of any kind. The Postal Service recommended, instead, that plaintiff reapply in the event that adequate treatment could be secured and his hypertension be controlled. (R. 130). The Court will not substitute its opinion for that of the agency where there is substantial evidence to support the agency's findings especially where matters of medical opinion are concerned. In this case, plaintiff was shown to be disabled and unqualified for all positions because of his uncontrolled hypertension and hypertensive cardiovascular disease. The blood pressure readings, electrocardiograms, and x-rays all support this finding.

Plaintiff argues that the MSPB was arbitrary and capricious in disregarding the fact that the Postal Service did not re-examine plaintiff as instructed in its November 3, 1978 decision. (R. 117). This error is harmless, however, since plaintiff's blood pressure readings taken by the V. A. Outpatient Clinic on December 8, 1978, were 160/118 and 190/130. These readings indicated that plaintiff's hypertension was still uncontrolled.

Finally, plaintiff argues that the MSPB erred in not deciding in its second decision whether 5 C.F.R. § 353.304 (right of reinstatement upon completion of military enlistment) conflicted with Article XIII of the Collective Bargaining Agreement (5 year service minimum required for light duty status). The Court holds, however, that the MSPB did not err since there is substantial evidence on the record supporting the Postal Service's decision and the affirmation of that decision by the MSPB that plaintiff was medically unqualified for *all* of the positions available in the Postal Service—light duty status or regular assignment. Therefore, this issue need not have been decided because of plaintiff's medical unsuitability for any position in the Postal Service. For these reasons, defendants' cross-motions for partial summary judgment will be granted on the basis of the administrative record and plaintiff's cross-motion for summary judgment will be denied.[5]

## II. Rehabilitation Act Claim

Plaintiff also contends that the Postal Service's decision to deny plaintiff reinstatement based on his disability violates the Rehabilitation Act of 1973, as amended, 29 U.S.C. § 701 *et seq.* Plaintiff has also asserted claims under four other provisions: the Anti-Discrimination in Federal Employment Act, 5 U.S.C. § 7203; Section 1003(b) of the Postal Reorganization Act of 1970, 39 U.S.C. § 1003(b); Section 403(a) of the Vietnam Era Veterans' Readjustment Assistance Act of 1974, 38 U.S.C. § 2014(a); and the due process clause of the Fifth Amendment of the United States Constitution. These claims have been withdrawn by plaintiff in response to the Postal Service's arguments that 29 U.S.C. § 791 serves as the exclusive remedy for complaints in federal employment on the basis of handicap discrimination. *See Memorandum In Support of Plaintiff's Motion for Partial Summary Judgment,* at 1 n.1.

## A. Findings of Fact

1. Plaintiff William L. Bey was born on August 14, 1952, is a citizen of the United States and resides in Philadelphia, Pennsylvania. (Answer to Complaint, ¶ 6). (Stipulated Fact No. 1).

2. Defendant William F. Bolger is Postmaster General and, as such, is statutorily responsible for the administration of the United States Postal Service. (Answer to Complaint, ¶ 7). (Stipulated Fact No. 2).

3. Defendant United States Postal Service is an independent establishment of the executive branch of the United States Government, with the statutory responsibility set forth in the Postal Reorganization Act, 39 U.S.C. § 101, *et seq.* to provide postal services. (Answer to Complaint, ¶ 8). (Stipulated Fact No. 3).

4. Defendant Merit Systems Protection Board is an agency of the United States Government with the responsibility for hearing and adjudicating appeals by federal employees of adverse personnel actions, including. denial of re-employment rights. The Board is the successor agency to the United States Civil Service Commission. (Answer to Complaint, ¶ 9). (Stipulated Fact No. 4).

5. Plaintiff worked as a clerk with the Postal Service from November 12, 1973 to February 8, 1976. Plaintiff's primary position was Distribution Clerk. His job consisted of sitting at a case and sorting mail according to the zip code of the letter carriers. His day consisted of an eight-hour shift with two breaks and lunch time. From time to time, he worked on other floors in the main post office, and his duties

---

**5.** Plaintiff also argues that the MSPB erred in not commenting on the evidence submitted by Dr. Weinstock (R. 136) and Dr. Nathanson (R. 134). This evidence, nevertheless, appears to be inconclusive. Dr. Weinstock stated that plaintiff was being treated for "severe hypertension" and that "[h]e is able to work with a diastolic pressure at 100, doing light non-physical work." (R. 136). Dr. Nathanson stated that "[t]his man is currently a well controlled hypertensive" and based his finding upon a single blood pressure reading of 135/85. (R. 134). Even accepting this evidence, the weight of the evidence indicates that plaintiff suffered from uncontrolled hypertension and there is substantial evidence on the record to support the findings of the Postal Service and the MSPB.

consisted of sorting bulk mail and small boxes. (N.T. 1–31 through 37, 122 through 124).

6. On February 9, 1976, Bey enlisted in the United States Navy. His position was that of Radio Room Operator in which he operated teletype machines and other communications equipment. Because of the sensitivity of the equipment, his duty station was air conditioned. His duties required that he work an eight-hour shift. (N.T. 1–37–38, 42–43).

7. In November, 1976, while in the Navy, plaintiff was diagnosed as suffering from hypertension and cold urticaria. (Stipulated Fact No. 6). (N.T. 1–38–39).

8. Plaintiff did not, thereafter, work as a Radio Room Operator, except in the security office, because of his sensitivity to cold and his cold urticaria.

9. Plaintiff was hospitalized in December, 1976 to January, 1977 for three weeks in Portsmouth Naval Hospital for observation and treatment for cold urticaria and hypertension. (N.T. 1–41–42).

10. Thereafter, plaintiff was examined each month for treatment. (N.T. 1–41–42).

11. Plaintiff worked light duty assignments in the security office as a radio room operator and as a cashier in the gymnasium for the remainder of his enlistment with the Navy. (N.T. 1–42–43).

12. Plaintiff was separated from the Navy with a temporary 30 per cent disability on February 20, 1978. (Stipulated Fact No. 7). (DD Form 214N, William L. Bey).

13. On March 28, 1978, plaintiff applied for re-employment in his former position, Distribution Clerk, Level 5, with the Postal Service in Philadelphia, Pennsylvania. (Stipulated Fact No. 8).

14. During the course of a physical examination, on March 29, 1978, Irvin F. Hermann, M. D., then Area Medical Officer for the Postal Service (now National Medical Director), obtained the following blood pressure readings from plaintiff: 180/120 and 170/115 (upright) and 165/115 and 180/115 (reclining). (Stipulated Fact No. 9).

15. At the time of the examination, Bey had been under the medical care of physicians at the Naval Regional Medical Center in Portsmouth, Virginia, and he had been faithful in taking his medication for about one year. However, because he was driving to the examination in Philadelphia from Virginia and he was fearful that the medication would make him dizzy, he failed to take his medication that day and so informed Dr. Hermann. Following the examination, he resumed taking his regular dosage. (N.T. 1–51–55; 3–10).

16. Dr. Hermann measured plaintiff's blood pressure again on April 18, 1978, where it registered 160/100 (sitting and lying). (Stipulated Fact No. 10).

17. On April 18, 1978, Dr. Hermann noted that plaintiff suffered from elevated blood pressure, and he wrote that "[t]his man does not qualify and should reapply at a later date after adequate treatment." (Stipulated Fact No. 11).

18. Medical officers at the Postal Service tested plaintiff's blood pressure on three more occasions. On May 3, 1978, it measured 165/110; on June 8, 1978, it measured 170/110, 180/120, 168/110, and on June 29, 1978, it measured 168/118 and 174/115. As a result, it was the opinion of the various medical officers that plaintiff was unsuitable for employment with the Postal Service. (Stipulated Fact No. 12).

19. Dr. Hermann recommended that the Postal Service not hire the plaintiff on grounds of uncontrolled hypertension. (Stipulated Fact No. 13).

20. Dr. Hermann stated in an affidavit that plaintiff "was rejected because he did not pass the physical examination.... Handicaps of such a nature cannot be provided for in the absence of obvious lack of control." (Stipulated Fact No. 14).

21. On June 29, 1978, Dominic J. Scola, an employment officer for the Postal Service, determined that plaintiff should not be restored to employment with the Postal Service. He based this decision solely upon Dr. Hermann's recommendation, and he stated in an affidavit that "[n]o considera-

tion was given to Mr. Bey's former record, and had he successfully passed the physical ... he would have been reemployed." (Stipulated Fact No. 15).

22. On July 5, 1978, A. E. Duncanson, Postmaster, Philadelphia District, Postal Service, wrote that plaintiff's "request for Reemployment-Military must be disapproved because of physical disqualification due to failure to meet the physical requirements for employment in the Postal Service." Mr. Duncanson based this decision on the facts that "on March 29, 1978 [Bey was] examined by the Medical Officer and found to have elevated blood pressure. Subsequently, [he was] again examined on four (4) different occasions, April 18, May 3, June 8, and June 29, 1978, and each resulted in the same finding of uncontrolled elevated blood pressure." (Stipulated Fact No. 16).

23. On July 14, 1978, Bey filed an appeal of this determination to the United States Civil Service Commission, Federal Employee Appeals Authority (hereinafter "FEAA") (predecessor agency to the Merit Systems Protection Board) on grounds that the Postal Service had violated his rights to restoration to duty under 5 C.F.R. Part 353. (Stipulated Fact No. 17).

24. On August 31, 1978, plaintiff asked the FEAA to assist him in obtaining "light duty" work with the Postal Service. (Stipulated Fact No. 18).

25. On October 16, 1978, Gerald P. Tognetti, an assistant appeals officer of the FEAA, asked Bruce Dixon, Manager, Labor Relations, Philadelphia Sectional Center Facility, Postal Service, to respond to plaintiff's request for light duty assignments. (Stipulated Fact No. 19).

26. On October 27, 1978, Mr. Dixon advised Mr. Tognetti that plaintiff could not be considered for light duty assignments because the collective bargaining agreement between the Postal Service and its workers restricted light duty assignments to employees with at least five years of service, and the plaintiff, at that time, only had two years and three months employment. (Stipulated Fact No. 20).

27. Even if the two years of military service had been added to that of his two years and three months employment, plaintiff would still have not been eligible for light duty assignments because the sum total would have been four years and three months' experience.

28. On November 3, 1978, the FEAA reversed the July 5, 1978 action of the Postal Service in denying plaintiff restoration to duty following military service. (Stipulated Fact No. 21).

29. The FEAA concluded that the Postal Service had failed to comply with the requirements of Part 353 of the Civil Service regulations by failing to consider plaintiff for any position with the Postal Service rather than just considering plaintiff for reinstatement to Distribution Clerk, Level 5. The FEAA recommended that the Postal Service "restore [plaintiff] to a position for which he qualifies after having again been medically examined and having had the criteria set forth in the FPM, Chapter 353, Appendix B–4 applied to all positions for which he is entitled to be considered pursuant to 5 C.F.R. 353.303 and 304. ... Should such recommended corrective action result in the appellant being restored to employment, such restoration must be retroactive to the time frame prescribed by 5 CFR 353.302. ... Should such recommended corrective action result in a new determination that the appellant is medically disqualified for restoration, such new determination will be subject to a new appeal." (Stipulated Fact No. 22).

30. On November 13, 1978, Mr. Dixon, in compliance with the FEAA decision, asked plaintiff to submit, through his treating physician, "a complete medical file to include the following medical information:

1) history of your physical condition/hypertension

2) results of a current physical examination

3) results and conclusions of any and all pertinent studies

4) prognosis relative to your hypertensive condition

5) any and all limitations (to include duration of each) emanating from your hypertensive state."

Plaintiff was told that his

". . . treating physician must submit this medical data to the Post Office Medical Officer–I. Herman, M. D., will review and evaluate the report for the purpose of determining your ability to perform in a duty assignment with the postal service. Also, in determining your physical suitability for employment, you may be re-examined by Dr. Herman after receipt of your treating physician's full medical report. (If necessary, you will receive separate notification regarding an examination by Dr. Herman.)."

(Stipulated Fact No. 23).

31. The Veterans Administration Hospital in Philadelphia, at plaintiff's request, sent copies of plaintiff's medical records to the Postal Service. The records were received by the medical office of the Postal Service on December 5, 1978. The records included doctor's progress notes of physical examinations from May through November, 1978. (Stipulated Fact No. 24).

32. The records included a report of x-rays of Mr. Bey's heart taken on June 5, 1978 by D. B. Wexlar, M. D., which indicated "[t]he heart shows moderate enlargement to the left." (X-ray report, D. B. Wexlar, M. D., June 8, 1978).

33. The records also included an electrocardiogram taken of Mr. Bey on June 18, 1978. (EKG report, June 18, 1978).

34. The electrocardiogram taken on June 18, 1978 revealed a left ventricular hypertrophy with an appreciable strain pattern of T wave abnormality. This abnormality was a direct result of plaintiff's hypertensive condition. (N.T. 3–49–57–58–70–71).

35. During the relevant time period, plaintiff's blood pressure had been repeatedly tested. The following is a list of blood pressure readings and the date and place where they were taken:

| DATE | PLACE | BLOOD PRESSURE READING |
|------|-------|------------------------|
| 1978 | | |
| February 24 | Navy, Virginia | 160/110 |
| March 29 | Postal Service | 184/116; 180/120, 170/115 (upright) 165/115, 180/115 (reclining) |
| March 31 | Navy, Virginia | 132/96 |
| April 3 | Navy, Virginia | 158/86 |
| April 7 | Navy, Virginia | 154/98 |
| April 18 | Postal Service | 160/100 (sitting & lying) |
| May 3 | Postal Service | 165/110, 158/102 |
| May 19 | VA Clinic | 170/115 170/118 180/115 |
| May 19 | VA Clinic | 150/90 |
| May 22 | VA Clinic | 150/90 |
| May 25 | VA Clinic | 150/110 |
| May 26 | Navy, Philadelphia | 130/96 |
| May 30 | Navy, Philadelphia | 152/100 |
| June 2 | Navy, Philadelphia | 146/98 |
| June 2 | VA Clinic | 150/100, 140/95 140/95 |
| June 8 | Postal Service | 170/110, 180/120 168/110 |
| June 12 | VA Clinic | 180/80 |
| June 29 | Postal Service | 168/118 174/115 |
| July 18 | VA Clinic | 180/100 |
| August 11 | VA Clinic | 140/90 |
| August 31 | Robert M. Weinstock, M.D. | –/100 |
| September 18 | Julia F. Nathanson, M.D. | 135/85 |
| December 8 | VA Clinic | 160/110, 190/130 |

(Stipulated Fact No. 38). (Plaintiff's Exhibits Nos. 2, 4, 21–28).

36. After reviewing the records submitted, on December 6, 1978, Dr. Hermann wrote to the Postal Service personnel office that plaintiff had "hypertensive cardio-vascular disease with cardiac enlargement, abnormal EKG and poorly controlled blood pressure levels." It was his opinion that plaintiff did "not meet the requirements for any position in the Postal Service." (Stipulated Fact No. 26). (N.T. 3–49–50).

37. On December 28, 1978, Dixon advised plaintiff that:

". . . After receipt (on December 6, 1978) of medical reports from your treating

physician(s) (of the VA Outpatient Clinic), a review of two postal medical officers concluded that at this time you are physically unfit for any employment due to your continuing uncontrolled blood pressure, your cardiac enlargement and your abnormal EKG which evidenced left sided strain of the heart.

"Our records indicate that subsequent to your March 28, 1978 application for re-employment, you were examined on five different occasions—March 29, April 18, May 3, June 8 and June 29, 1978—each time of which resulted in the same finding of uncontrolled elevated blood pressure. Records also disclose your claim that you were then under treatment for this condition. However, review of postal physicians of recent VA medical reports reflect no improvement of your physical condition.

"Therefore, we regret to advise you that your request for re-employment-military must be disapproved since you physically disqualify as a result of failing to meet the physical employment standards for any position in the postal service."

(Stipulated Fact No. 27).

38. Neither Dr. Hermann nor any other medical officer of the Postal Service performed a physical examination on plaintiff between June 29 and December 28, 1978. (Stipulated Fact No. 28).

39. On August 28, 1978, plaintiff filed a formal complaint of discrimination on account of physical handicap against Dr. Hermann with the Postal Service's Equal Employment Opportunity Branch in Philadelphia. (Stipulated Fact No. 33).

40. Thereafter, the complaint of handicap discrimination was investigated by an EEO investigator for the Postal Service, a report was issued and the Delaware Valley district manager, Charles J. Langmaack, issued a proposed decision denying the allegations of the complaint on June 21, 1979. (Stipulated Fact No. 34).

41. On June 29, 1979, the Postal Service requested that the Equal Employment Opportunity commission appoint a complaints examiner to conduct a hearing. (Stipulated Fact No. 35). Plaintiff's complaint was scheduled for a hearing to be conducted by the Equal Employment Opportunity Commission on December 16, 1980. Plaintiff's representative by letter dated November 3, 1980, requested that the hearing be cancelled. Thereupon, the Postal Service issued a final decision on April 10, 1981 stating:

"The investigative file has been thoroughly reviewed and has been found to contain sufficient information on which to base a sound decision. This is premised on the fact that subsequent to your initial medical examination, you were examined on four (4) other occasions, April 18, May 3, June 8, and June 29, 1978. In each instance the results indicated an uncontrolled elevated blood pressure which made you unsuitable for reemployment.

"The subsequent re-examinations are evidence of the Postal Service's effort to accommodate you based upon your condition. However, Postal Service Employment Policy does not allow the employment of persons who are found to be medically unsuitable.

"In view of the above, your complaint is closed with a determination of no discrimination."

(Stipulated Fact No. 35).

42. The Postal Service failed to take final action on this complaint by May 16, 1980 (date of suit). (Stipulated Fact No. 36).

43. Blood pressure is determined by measuring the resistance of the heart to the blood flow through a person's arteries. The measurement is expressed in terms of the systolic blood pressure (a measurement of the heart's pumping action) and the diastolic blood pressure (a measurement of the relaxation phase of the heart's cycle). (N.T. 1–180). Top normal blood pressure in adults under current medical standards is measured at a systolic of 140 milligrams of mercury over a diastolic of 90 milligrams of mercury. (N.T. 3–73). Blood pressure with measurements higher than this is considered high blood pressure or hypertension. Based on current national standards: mild hypertension is a diastolic reading of 90 to

105, moderate hypertension is a diastolic reading between 105 and 115 and severe hypertension is a diastolic reading of 115 or over. (N.T. 3–76–77).

44. Severe hypertension may result in end organ damage particularly in the eye grounds, the kidney and the brain. (N.T. 3–77). Hypertension can result in atherosclerosis (hardening of the arteries), coronary disease, heart attacks and strokes. (N.T. 3–83–34).

45. The mean of plaintiff's blood pressure readings in early 1978 was 164/106. The mean for the latter part of 1978 was 158/104. (N.T. 3–84).

46. Plaintiff's electrocardiogram taken on June 18, 1978 and x-rays of plaintiff's heart on June 5, 1978, revealed hypertensive cardiovascular disease and moderate enlargement of the heart to the left (N.T. 3–85).

47. Noise, supervision, and physical job demands directly impact upon an individual's blood pressure. (N.T. 3–87–90).

48. Evidence of hypertension and elevated blood pressure in young individuals can lead to serious heart disease and other physical ailments if left untreated. (N.T. 3–94).

49. Plaintiff testified before the Physical Evaluation Board in Bethesda, Maryland on June 10, 1980, that his current blood pressure on June 4, 1980, was 180/120, that his blood pressure was higher in the past, that he infrequently receives a pain right between his left shoulder blade when engaged in lifting, that he was told by the VA that it would not be wise that he play basketball, tennis, or lift anything heavy, that he gets tired easily, and that he gets short-winded when engaged in strenuous physical activity. (Physical Evaluation Board, Transcript of Testimony, June 10, 1980, at 2–3).

50. Persons with high blood pressure can be treated with medications and with diet restrictions. Through the right combination of medications, a physician can help to lower and frequently normalize the blood pressure in a person suffering from hypertension. Thus, a person's blood pressure can be considered under control if it is lowered to 140/90; however, even if a blood pressure only can be brought under partial control, i.e., a clinically significant reduction in pressure from a high base line measurement to a figure above 140/90, the person can still derive therapeutic benefit. (N.T. 2–7 through 2–12; Exhibits P–49 and 50).

51. The position of Distribution Clerk, Level 5, involves the basic function of separating mail in a post office, terminal, airmail field or other postal facility in accordance with established schemes, including incoming or outgoing mail or both. Clerks handle heavy stacks of letter mail, paper mail and parcel post weighing up to 70 pounds and sort and distribute mail to post offices and carrier routes in accordance with established schemes. They may also perform a variety of services at public windows at post offices, post office branches or stations and perform related duties as assigned. The work involves continuous standing, distribution of mail, stretching and reaching. (U. S. Postal Service Qualification Standard).

52. Clerks must be physically able to perform efficiently the duties of the position which require arduous exertion involving prolonged standing, walking, distributing and reaching and may involve the handling of heavy stacks of mail. On outside assignments this work is performed in all kinds of weather. Applicants for the position will be disqualified for appointment if they have an irremedial or incurable defect or disease which prevents efficient performance of duty or which renders them a hazard to themselves, fellow employees or others. (U. S. Postal Service Qualification Standard).

53. The position of Distribution Clerk results in physical strain due to the nature of the work and the stress caused by close supervision. (N.T. 3–87–3–90).

54. Article XIII of the Collective Bargaining Agreement between the United States Postal Service and its employees provides for temporary or permanent reassignments for "light duty" status for "any ill or injured full-time regular or part-time flexi-

ble employee having a minimum of five years of postal service, or any full-time regular or part-time flexible employee who sustained injury on duty, regardless of years of service." Article XIII, Collective Bargaining Agreement (July 21, 1978–July 20, 1981).

55. The use of a blood pressure control standard for employment situations is reasonable and consistent with sound medical judgment, and the prevailing medical standard in the community. (N.T. 3–73–76).

56. During the period of 1978, plaintiff had "uncontrolled" or "poorly controlled" hypertension and suffered from hypertensive cardiovascular disease. (N.T. 3–84–85).

57. Medical evidence submitted reveals no evidence to indicate that plaintiff's hypertension was adequately treated or controlled from March 28, 1978 to December 28, 1978.

58. Dr. Hermann had recommended that plaintiff "should reapply at a later date after adequate treatment." (Certificate of Medical Examination, Attached Note, April 18, 1978).

59. Plaintiff was given a reasonable time to demonstrate control of his hypertension.

### B. Discussion

The Rehabilitation Act of 1973, 29 U.S.C. § 701 *et seq.* was passed by Congress in 1973 in order to "promote and expand employment opportunities in the public and private sectors for handicapped individuals and to place such individuals in employment." 29 U.S.C. § 701(8) (amended 1978). Section 501(b) of the Act defines the responsibilities of the federal government with respect to providing employment opportunities to handicapped individuals:

> Each department, agency, and instrumentality (including the United States Postal Service and the Postal Rate Commission) in the executive branch shall ... submit to the Civil Service Commission and to the [Interagency Committee on Handicapped Employees] an affirmative action program plan for the hiring, placement, and advancement of handicapped individuals in such department, agency, or in-

strumentality. Such plan shall include a description of the extent to which and methods whereby the special needs of handicapped employees are being met. . . .

29 U.S.C. § 791(b).

In 1978, the Act was amended by Congress in order to expressly prohibit any discrimination by any federal government agency or the United States Postal Service against handicapped individuals with respect to employment opportunities for which the individual is otherwise qualified. Section 794, 29 U.S.C. provides in pertinent part:

> § 794. Nondiscrimination under federal grants and programs; promulgation of rules and regulations
>
> No otherwise qualified handicapped individual in the United States, as defined in section 706(7) of this title, shall, solely by reason of his handicap, be excluded from the participation in, be denied the benefits of, or be subjected to discrimination under any program or activity receiving Federal financial assistance or under any program or activity conducted by any Executive agency or by the United States Postal Service. The head of each such agency shall promulgate such regulations as may be necessary to carry out the amendments to this section made by the Rehabilitation, Comprehensive Services, and Developmental Disabilities Act of 1978.

Pursuant to 29 U.S.C. § 706(7)(A) and (B), a "handicapped individual" is defined as "any individual who (i) has a physical or mental disability which for such individual constitutes or results in a substantial handicap to employment and (ii) can reasonably be expected to benefit in terms of employability from vocational rehabilitation services provided pursuant to subchapters I and III of this chapter" and "any person who (i) has a physical or mental impairment which substantially limits one or more of such person's major life activities, (ii) has a record of such an impairment, or (iii) is regarded as having such an impairment." The term "physical or mental impairment" has been

defined under federal regulations as "any physiological disorder or condition, cosmetic disfigurement, or anatomical loss affecting one or more of the following body systems: "..., cardiovascular ....", 29 C.F.R. § 1613.702(b)(1) (1981); and the term "major life activities" is defined as "functions, such as caring for one's self, performing manual tasks, walking, seeing, hearing, speaking, breathing, learning and working," 29 C.F.R. § 1613.702(c) (1981). Lastly, the term "is regarded as having such an impairment" means:

> (1) has a physical or mental impairment that does not substantially limit major life activities but is treated by an employer as constituting such a limitation; (2) has a physical or mental impairment that substantially limits major life activities only as a result of the attitude of an employer toward such impairment; (3) or has none of the impairments defined in (b) of this section but is treated by an employer as having such an impairment.

29 C.F.R. § 1613.702(e).

Although the Supreme Court has not ruled on the question of whether § 504 of the Rehabilitation Act creates a private cause of action in favor of a handicapped individual, *see Southeastern Community College v. Davis*, 442 U.S. 397, 404 n.4, 99 S.Ct. 2361, 2366 n.4, (1979), the Third Circuit Court of Appeals and other circuits have ruled that an implied cause of action exists for the redress of handicap discrimination under § 504 of the Act. *Doe v. New York University*, 666 F.2d 761 (2d Cir. 1981); *Prewitt v. United States Postal Service*, 622 F.2d 292 (5th Cir. 1981); *Camenisch v. University of Texas*, 616 F.2d 127 (5th Cir. 1980), *vacated on other grounds*, 451 U.S. 390, 101 S.Ct. 1830, 68 L.Ed.2d 175 (1981); *N.A.A.C.P. v. Medical Center, Inc.*, 599 F.2d 1247 (3d Cir. 1979). Therefore, this Court has jurisdiction pursuant to 29 U.S.C. § 794.

In *Prewitt v. United States Postal Service*, 662 F.2d 292 (5th Cir. 1981), the Fifth Circuit recently addressed the issue of burden of proof in a handicap discrimination suit brought pursuant to the 1978 amendments to the Rehabilitation Act. In that case, the plaintiff had alleged that the United States Postal Service had violated his rights under the Rehabilitation Act, as amended, 29 U.S.C. § 701 *et seq.*, in denying his application for the position of a clerk/carrier with the Postal Service because of his 30% service-related disability—a limited mobility of his left arm and shoulder—suffered as a result of gunshot wounds inflicted in Vietnam, and because of kidney disease, hypertension, and an eye condition not related to his armed forces service. The Fifth Circuit reversed the lower court's order granting defendant's motion for summary judgment, because the lower court had erred by assuming that this "substantial disability" constituted sufficient grounds for rejecting the plaintiff's bid for the clerk/carrier position. After finding that there were genuine issues of material fact which precluded summary judgment, the Fifth Circuit remanded the case to the district court with the following instructions with respect to the burden of proof:

> (1) Prewitt, the disabled claimant, may establish a prima facie of unlawful discrimination by proving that: (a) except for his physical handicap, he is qualified to fill the position; (b) he has a handicap that prevents him from meeting the physical criteria for employment; and (c) the challenged physical standards have a disproportionate impact on persons having the same handicap from which he suffers. To sustain this prima facie case, there should also be a facial showing or at least plausible reasons to believe that the handicap can be accommodated or that the physical criteria are not "job related."

> (2) Once the prima facie case of handicap discrimination is established, the burden of persuasion shifts to the federal employer to show that the physical criteria offered as justification for refusal to hire the plaintiff are "job related," i.e., that persons who suffer from the handicap plaintiff suffers and who are, therefore, unable to meet the challenged standards, cannot safely and efficiently perform the essentials of the position in question. If the issue of reasonable accommodation is

raised, the agency must then be prepared to make a further showing that accommodation cannot reasonably be made that would enable the handicapped applicant to perform the essentials of the job adequately and safely; in this regard, the postal service must "demonstrate that the accommodation would impose an undue hardship on the operation of its program," 29 C.F.R. § 1613.704(a), taking into consideration the factors set forth by 704(c) of the cited regulation.

(3) If the employer proves that the challenged requirements are job related, the plaintiff may then show that other selection criteria without a similar discriminatory effect would also serve the employer's legitimate interest in efficient and trustworthy workmanship. *Dothard v. Rawlinson*, 433 U.S. 321, 329, 97 S.Ct. 2720, 2726, 53 L.Ed.2d 786 (1977); *Johnson v. Uncle Ben's, Inc.*, 657 F.2d 750, 752 (5th Cir. 1981). When the issue of reasonable accommodation is raised, the burden of persuasion in proving inability to accommodate always remains on the employer; however, once the employer presents credible evidence that reasonable accommodation is not possible or practicable, the plaintiff must bear the burden of coming forward with evidence that suggests that accommodation may in fact be reasonably made.

622 F.2d at 309–310.

■■■ The Fifth Circuit identified four different and distinct types of discriminatory barriers that confront handicapped persons when seeking employment positions: (1) intentional discrimination for reasons of social bias against handicapped individuals, (2) neutral standards with disparate impact, (3) surmountable impairment barriers, and (4) insurmountable impairment barriers. *Prewitt v. United States Postal Service, supra*, 662 F.2d at 305 n.19. First, in an intentional discrimination claim, the plaintiff must show that the defendant intentionally discriminated against the plaintiff because of the defendant's own personal bias against handicapped individuals. Second, in a "disparate impact" discrimination claim, the plaintiff must show to establish a prima facie case that "the challenged

standard disparately disadvantages the protected group of which he is a member, and that he is qualified for the position under all but the challenged criteria." 662 F.2d at 306. The burden of persuasion then shifts to the employer to show "that the challenged criteria are 'job related,' i.e., that they are required by 'business necessity.'" *Id.* The Fifth Circuit stated: "The test is whether a handicapped individual who meets all employment criteria except for the challenged discriminatory criteria 'can perform the essential functions of the position in question without endangering the health and safety of the individuals or others.'" *Id.* at 307. If an employer can show that the challenged physical criteria are job-related, then the handicapped individual must bear the burden of persuasion to show that he can satisfy these criteria. *Id.* Third, in a "surmountable barrier" discrimination claim, the employer has an obligation to provide reasonable accommodation for the handicapped individual. 622 F.2d at 307. The plaintiff must show that he is an "otherwise qualified handicapped individual." The employer then has the burden of persuasion to show that a "reasonable accommodation" cannot be made. *Id.* at 308. Factors to be considered in determining whether an accommodation would impose an undue hardship on the operation of the agency would include: "(1) The overall size of the agency's program with respect to the number of employees, number and type of facilities and size of budget; (2) the type of agency operation, including the composition and structure of the agency's work force; and (3) the nature and the cost of the accommodation." *Id.* (quoting EEOC regulation, 29 C.F.R. § 1613.704). The plaintiff must make some showing "concerning his individual capabilities and suggestions for possible accommodations" if the agency presents credible evidence that accommodation would not be reasonably possible. *Id.* In any event, the burden of persuasion in proving the inability to accommodate the handicapped applicant remains always on the employer. *Id.* Finally, in an "insurmountable barrier" discrimination claim, the Courts have not addressed this issue and we need not address it here.

### (1)

 The plaintiff has established a prima facie case for unlawful handicap discrimination since he has adequately demonstrated that: (a) except for his physical handicap, he is qualified to fill the position; (b) he has a handicap that prevents him from meeting the physical criteria for employment; and (c) the challenged physical standards have a disproportionate impact on persons having the same handicap from which he suffers. The Postal Service has conceded that plaintiff would have been reinstated to his former position or a position with like seniority or pay but for his uncontrolled hypertension and cardio-vascular disease. Nevertheless, the Postal Service has sufficiently met its burden of persuasion in showing that the physical criteria offered as the justification for its refusal to hire the plaintiff—plaintiff's uncontrolled hypertension and cardio-vascular disease—are "job-related" in that plaintiff cannot safely and efficiently perform the essential functions of the position without endangering his own health and safety. The testimony of Dr. Hermann and Dr. Makous, which the Court credits rather than the testimony of Dr. Onesti, demonstrates that plaintiff's uncontrolled hypertension and hypertensive cardio-vascular disease at the time of his application through March to December in 1978, made it impossible for plaintiff to perform the essential functions of a Postal Service position without endangering his own health and safety. There was a substantial likelihood that plaintiff could suffer further damage via a heart attack, stroke, or further end organ damage in the event that plaintiff had been reinstated to a position with the Postal Service with its accompanying rigorous physical requirements (U. S. Postal Service Qualification Standard) and exposure to noise levels and close supervision. The obtained blood pressure readings, x-ray of plaintiff's chest, electrocardiogram, and plaintiff's own testimony before the Medical Review Board support these findings. Moreover, plaintiff was provided an opportunity to reapply for a position in the event that adequate treatment for his uncontrolled hypertension could be obtained. Plaintiff did not meet his burden once the burden had again shifted since he never demonstrated an ability to satisfy these job-related criteria. Plaintiff did not provide any evidence in support of his position that his hypertension was being adequately controlled during the time period in which he applied which would, thereby, decrease the risks of heart attack, stroke, or end organ damage in the event that he were re-employed. The only evidence submitted by plaintiff supportive of his position was that of a note from Dr. Nathanson on September 18, 1978, which is based on a one time visit for a vocation rehabilitation program. Moreover, the records obtained from the V. A. Clinic support the Postal Service's determination that plaintiff's hypertension was uncontrolled and that his cardio-vascular disease made him unsuitable for reinstatement and reemployment. Thus, the Court has found that the Postal Service has met its burden of proof and shown that these physical criteria are job-related. Plaintiff has not met his burden in showing that he would have satisfied these physical criteria. Therefore, plaintiff cannot prevail on this claim.

### (2)

 Next, the Court must address the issue of accommodation. The defendant has the burden of persuasion on this issue and must show that a reasonable accommodation could not have been made. Plaintiff claims that he should have at least been reinstated to employment and provided with "light duty status." The Court holds, however, that the defendant has met its burden of proof and shown by a preponderance of the evidence that, even if such a position were offered, plaintiff could not have performed the essential functions of a light duty status position without endangering his own health and safety because of his uncontrolled hypertension and cardio-vascular disease. The work conditions of the Postal Service could only have worsened his condition and increased the risk of stroke, heart attack, or further end organ damage. We must keep in mind that plaintiff was only twenty-five years old at the time that he applied and that his condition was extremely unusual for a young man.

Secondly, even if we were to assume *arguendo* that plaintiff was physically qualified to perform light duty status, the Court holds under the present facts that the Postal Service has adequately met its burden of persuasion that such an accommodation could not have been reasonably made due to an undue hardship on the operation of its program because of the nature of the Postal Service's operation, the composition of its work force, and the nature and the cost of any accommodation. In this case, Article XIII of the Collective Bargaining Agreement between the United States Postal Service and its employees provides that ill or injured regular work force employees may be temporarily or permanently reassigned to "light duty status" as an accommodation for deserving full-time regular or part-time flexible employees. In order to qualify for permanent assignment to "light duty status," an employee must first have a minimum of five years of Postal Service experience or sustained the injury on-the-job regardless of the number of years of service and experience. Nevertheless, even if we were to add the two years of military service to plaintiff's two years and three months of prior Postal Service employment and service, the plaintiff would still not have met this minimum five year requirement for "light duty" status. Moreover, the development of hypertension and cardio-vascular disease while in the Navy does not meet the definition of physical "injury on duty" pursuant to the provisions of the Collective Bargaining Agreement. The Court finds that the Postal Service has a substantial interest in protecting its employees while maintaining a high level of efficiency and productivity within its program. Unfortunately, a limited number of light duty status assignments can only be made available before the general work efficiency will be reduced to an unacceptable level with its concomitant tax-payer expense. In this case, the five year minimum requirement is reasonably and substantially related to the Postal Service's purpose of providing a substantial benefit to its employees who are no longer able to meet the daily physical requirements of employment status while limiting these positions to per-

sons with the necessary seniority in order to maintain a high level of efficiency and to keep the attendant costs down. The Postal Service is not required under the law to offer "light duty status" positions to every person who applies because of the individual's handicap. Such an outcome would result in an extraordinary cost and would hamper the operation of the Postal Service. The five year requirement is valid on its face, it is substantially and reasonably related to a legitimate governmental purpose, and the Postal Service has met its burden of persuasion in showing that even if plaintiff had been physically qualified for light duty status, that such an accommodation could not have been reasonably made.

C. Conclusions of Law

1. This Court has jurisdiction over the subject matter of the action pursuant to Section 501 of the Rehabilitation Act of 1973, 29 U.S.C. § 791, as amended by the Comprehensive Rehabilitation Service Amendments of 1978, 29 U.S.C. § 794a.

2. Defendants William F. Bolger, as Postmaster General, and the United States Postal Service as a federal agency, are subject to 29 U.S.C. § 791 and the regulations adopted pursuant thereto, 29 C.F.R. § 1613.701 *et seq.*

3. Plaintiff is a "handicapped individual" within the meaning of 29 U.S.C. § 706(7) and 29 C.F.R. § 1613.702(a), in that plaintiff has a record of a physical impairment, cardio-vascular disease, and that in denying plaintiff employment as a Distribution Clerk, defendants regarded him as handicapped because of his continuing uncontrolled blood pressure, cardiac enlargement and abnormal electrocardiogram.

4. Plaintiff has established a prima facie case of disparate impact handicap discrimination in that plaintiff has established by a preponderance of the credible evidence that (1) except for his physical handicap, he is qualified to fill the position; (2) he has a handicap that prevents him from meeting the physical criteria for employment; and (3) the challenged physical standards have a disproportionate impact on persons having the same handicap from which he suffers.

5. Defendants have met their burden of persuasion and shown by a preponderance of the credible evidence that the physical criteria for employment are job-related and that the plaintiff cannot perform the essential functions of a Postal Service position without endangering the plaintiff's own health and safety.

6. Plaintiff has not met his burden of persuasion and has not shown by a preponderance of the credible evidence that he can satisfy the physical criteria found to be job-related above.

7. Defendants have also met their burden of persuasion and shown by a preponderance of the credible evidence that plaintiff could not have been reinstated with respect to a light duty status position without endangering his own health and safety while performing the essential functions of that position.

8. Defendants have also met their burden of persuasion and shown by a preponderance of the credible evidence that even if the plaintiff was physically qualified for light duty status, such an accommodation could not have been made because of Article XIII of the Collective Bargaining Agreement between the Postal Service and its employees and because such an accommodation would impose an undue hardship on the operation of the Postal Service.

An appropriate Order will be entered.

## ORDER

AND NOW, TO WIT, this 20th day of April, 1982, for the reasons expressed in the foregoing Memorandum, IT IS ORDERED as follows:

1. Defendants' motion for partial summary judgment is *granted* and plaintiff's motion for partial summary judgment is *denied*;

2. Plaintiff's claims under the Anti-Discrimination in Federal Employment Act, 5 U.S.C. § 7203, Section 1003(b) of the Postal Reorganization Act of 1970, 39 U.S.C. § 1003(b); Section 403(a) of the Vietnam Era Veterans' Readjustment Assistance Act of 1974, 38 U.S.C. § 2014(a), and the due process clause of the Fifth Amendment of the United States Constitution are *dismissed with prejudice*;

3. Judgment is *entered* in favor of defendants and against plaintiff on all three claims stated in plaintiff's complaint.