Ilan G. DEXLER

v.

Preston Robert TISCH.

Civ. No. H–83–333.

United States District Court, D. Connecticut.

May 20, 1987.

---

**34.** Plaintiffs have not alleged state claims. *See* Conn.Agencies Regs. 22a–430–4(t) and –3(*l*).

Robert B. Yules, Martin Wheeler, Yules & Yules, Hartford, Conn., for plaintiff.

W. Philip Jones, Asst. U.S. Atty., Hartford, Conn., David G. Karro, David P. Cybulski, Office of Labor Law, U.S. Postal Service, Washington, D.C., for defendant.

## MEMORANDUM OF DECISION

BLUMENFELD, Senior District Judge.

This is an action for damages and injunctive relief brought under the Rehabilitation Act of 1973, as amended, 29 U.S.C. §§ 791 *et seq.* Plaintiff Ilan Dexler, who suffers from achondroplastic dwarfism, applied for employment as a distribution clerk through the United States Postal Service's program for the severely handicapped, but was not hired. He claims that as a certified handicapped person, the Postal Service discriminated against him. After hearing testimony, reviewing the documentary evidence,

and considering the authority and arguments presented in the briefs, this court finds in favor of the defendant.

### Facts

Achondroplastic dwarfism is a growth disorder that affects all four extremities and results in short limbs and short stature. Because he suffers from this condition, Mr. Dexler is four feet, five inches tall (53 inches), and has a vertical reach of 58 and ½ inches. Though his exact horizontal reach was never put into evidence, his horizontal reach is substantially less than average. Mr. Dexler's trunk is of normal size and average strength. He weighs approximately 200 pounds.

Mr. Dexler is a high school graduate with significant work experience in private mailrooms of various commercial enterprises. Presently, he is the mailroom supervisor at United Bank and Trust's Corporate Center in Newington, Connecticut, where he supervises several employees and participates in sorting and distributing the mail. That mailroom processes approximately five to ten thousand pieces of mail daily. Last year Mr. Dexler earned nearly $18,000 at that job.[1]

### I. Chronology of Events

In the spring of 1982, Mr. Dexler contacted his vocational rehabilitation counselor to inquire about the possibility of obtaining employment with the post office. His counselor, Mr. Richard Carlson, wrote a letter to Ms. Doris Giles, an employment officer with the Postal Service, indicating that Mr. Dexler was a severely handicapped person under federal regulations and recommending him for an entry level position as a clerk or mail handler.

In July of 1982, Ms. Giles learned of an upcoming opening for the position of distribution clerk in the New Britain Post Office. She arranged for Mr. Dexler and his counselor to tour the post office on July 20,

---

1. From the date Mr. Dexler was denied the job which gave rise to this suit (August 23, 1982) until the beginning of 1987, he earned $67,382.68. The yearly breakdown is as follows:

| | |
|---|---|
| Aug. 23 to Dec. 31, 1982: | $ 5,001.63 |
| 1983: | $13,311.08 |
| 1984: | $13,580.66 |
| 1985: | $17,562.36 |
| 1986: | $17,926.95 |

1982. During that visit, she explained the Postal Service's program for the severely handicapped. If it was found that Dexler was qualified for the job and that his handicap could be reasonably accommodated, he would undergo an 89–day trial period as a casual employee. A casual employee works as needed and is paid $5 per hour. When a casual employee is called in to work, he or she is guaranteed a minimum of two hours. There is no guarantee of the number of hours of work that will be assigned per week, nor is there any guarantee of overtime. If Mr. Dexler completed the trial period satisfactorily, he would become a career employee working on a part-time, flexible basis, or, if there was some doubt about his ability to perform, he might be asked to do a second trial period. Part-time, flexible employees are called in on an as-needed basis. They are guaranteed four hours of work when called in, but are not given any guarantee as to the number of weekly work hours or overtime hours. At some point, Mr. Dexler would be changed to a full-time employee.

In the course of the tour of the facility, Mr. Dexler performed a number of tasks. He dumped a bag of mail onto a sorting table, he pushed various vehicles used to convey mail, and he put trays of mail on the highest shelf of a tray cart, but he had some difficulty in reaching the top bin of a sorting case. After the tour, Mr. Dexler's counselor completed a certification form, which stated that he had reviewed the job requirements, visited the job site, and that Mr. Dexler was capable of doing the job if the duty stations were lowered or if he used a step stool.

In August the postmaster of the New Britain Post Office interviewed Mr. Dexler for the distribution clerk position. The postmaster told Mr. Dexler that he thought Dexler could not do the job, and that accommodating his handicap would require

restructuring of the whole operation. Thereafter, Mr. Dexler received a letter from the post office confirming its position that it could not reasonably accommodate his handicap.

In September Mr. Dexler wrote a letter to the Equal Employment Opportunity Counselor for the Northeast Regional Office of the Postal Service alleging discrimination, and an informal investigation was begun. During the course of this investigation, Mr. George May, the Director of Employee Relations for Hartford Section Center of the Postal Service, and Ms. Doris Giles, the Employment Officer familiar with Mr. Dexler's case, reviewed the possibility of accommodating Mr. Dexler's condition. They spent most of a day at the New Britain Post Office evaluating the various duties of a distribution clerk and considering possible accommodations. They concluded that the New Britain Post Office could not reasonably accommodate Mr. Dexler as a distribution clerk. The EEO Counselor was not successful in resolving the case informally.

On November 13, 1982, Mr. Dexler filed a formal Equal Employment Opportunity complaint. After an EEO investigation, the complaint was denied. Thereafter, on April 27, 1983, Mr. Dexler filed the complaint in this court.

In the course of this litigation, during the fall of 1985, the Postal Service informed Mr. Dexler of job openings for distribution clerks and window/distribution clerks in the main postal facility at Weston Street in Hartford, Connecticut. After a tour of the facility, an explanation of the hours and wages, and a medical examination, Mr. Dexler was offered a choice of the jobs. To accommodate Mr. Dexler's handicap, he would be assigned to one sorting case where he would work from a large platform approximately eight inches above the ground.[2]

---

**2.** Had Mr. Dexler taken either of these jobs, he would have been subject to the same conditions under the program for the severely handicapped as if he had been given the New Britain job in 1982. He would have served an initial 89–day trial period as a casual employee, earning $5 an hour on an as-needed basis without a guaran-

teed number of weekly hours or overtime. If he performed satisfactorily, he would either be changed to career status (initially on a part-time, flexible basis, followed by full-time work), or he would be asked to serve a second trial period. As a part-time, flexible employee, he would work as needed for at least four hours at

For several months the Postal Service held the Hartford distribution clerk job open for Mr. Dexler, since he repeatedly rescheduled his orientation meeting. In December of 1985, after he was informed that the Postal Service could no longer keep the position open due to the heavy Christmas volume of mail to be processed, Mr. Dexler told Ms. Giles that he would be unable to take the position because an illness in the family required that he be out of town.[3]

## II. *Nature of the Work*

The duties of a distribution clerk at the New Britain Post Office are somewhat different from those of a distribution clerk at the Hartford office. New Britain is an associate post office and operates as an affiliated branch of the main office in Hartford. It receives mail intermittently each day from the Hartford office in large quantities, which must be processed according to numerous strict deadlines. In many instances, one step of the processing must be completed before it is efficient to begin the next step. Thus, the New Britain office has what might be described as a "task-oriented" approach. It cannot maintain an assembly-line operation because it does not have a continuous flow of mail coming into the post office. Distribution clerks therefore have a wide variety of duties, and are not assigned to any single particular task.

The various tasks that must be accomplished are as follows. Early in the morning, trucks arrive from Hartford loaded with mail in bulk containers ("BMCs" or "Post Cons").[4] These containers must be unloaded from the trucks, and other containers put in their place. The containers are then moved to a dumping station, where the bags or trays of mail they contain are unloaded. Next, the bags must be dumped on sorting tables and sorted into trays. As trays are filled, they are placed on various carts to be moved to a distribution center.

After this initial sorting into trays, the carts are moved to areas where the mail that is now in trays can be sorted more specifically into large cases.[5] These cases are generally about four feet wide with a wing on one side. Much of the work of a distribution clerk is this specific sorting, but because of the intermittent flow of mail from the Hartford facility and the deadlines for processing, a clerk could not be assigned to do an eight-hour shift consisting only of sorting at the cases. In the course of a shift, a typical distribution clerk will sort at three different cases, in addition to his other duties.

During the sorting of letters, the mail is periodically passed down the row of eight cases to be put into trays. When the "pass" command is given, the clerks in the row take the sorted mail out of the designated slot and pass it down the line, each adding sorted mail to the stack lined up on his or her arm. At the end of the line (usually of eight clerks), the sorted mail is put into a tray.

The trays of sorted mail are once again loaded on various conveyances to be moved to the area for mail carriers. Some of this sorted mail is taken to the post office box areas, where it is sorted and put in the appropriate boxes.

Even though this operation is task-oriented, not every clerk does each task daily.

---

a time with no guarantee of minimum weekly hours or overtime. If Mr. Dexler had taken the window/distribution clerk position, he would have been subject to the additional condition that he pass a written examination at the end of his casual employment.

**3.** Mr. Dexler claims that he turned down the Hartford job offer for financial reasons. However, even though the limited hours and low initial hourly wage might have caused some financial hardship for Mr. Dexler, those conditions were the same for both the New Britain and Hartford jobs. Moreover, Mr. Dexler did

not immediately reject the offer of employment in Hartford; he merely rescheduled his orientation meeting on several occasions, finally giving up his opportunity to take the job in December, four months after it was initially offered to him.

**4.** BMCs are Bulk Mail Carriers, and Post Cons are Postal Conveyances. Their physical descriptions will be given below.

**5.** Mail is sorted by class (first class or lower), by zipcode area, and by neighborhood (carrier route).

The work is generally divided on the basis of seniority, with the junior workers doing the largest amount of the heavy manual labor such as loading and unloading trucks and conveyances. Junior employees also must be trained for sorting, which is done for about two hours a day over a three-to-four-month period.

The Hartford office, in contrast to the New Britain office, runs more of an assembly-line operation. The volume and timing of mail deliveries to that office is such that clerks can be given specific tasks to do on a continuous basis. For example, the Hartford office has "mail handlers," who have the responsibility for unloading trucks and moving conveyances full of mail. Distribution clerks in that office may be assigned to sorting on a full-time basis.

### III. *Dexler's Ability To Do The Work*

#### A. *Physical Limitations*

Mr. Dexler's short stature and limited reach would prevent him from doing some of the tasks detailed above. His own experts testified that they would advise that he not load and unload trucks because of these limitations. In addition, he would have difficulty in loading and unloading mail from a BMC. A BMC is specially designed for processing mail in post offices. It is a metal box on wheels measuring 61″ x 71″ x 43″ used to move numerous canvas bags of mail. It has two doors: a front door that folds down from about the middle of the BMC, and a rear door the entire height of the box that is lifted up from the bottom and is locked in place at the top by a safety pin. Mr. Dexler would be able to open the front door, but would have difficulty in reaching the bags on the top of the stack in the back of the BMC. Also, he would be unable to reach through the front opening to the bottom of the BMC, though he could reach the bottom if the rear door were open. However, Mr. Dexler would be unable to open the rear door because he could not lift it high enough nor could he reach to put the safety pin in place.

Similarly, Mr. Dexler would have difficulty using a Post Con. A Post Con, also a specially designed piece of equipment, is a large metal cage measuring 42″ x 29″ x 70″ with two levels used to convey mail contained in trays and/or bags. Each level has a gate with a latch at the top of it. Mr. Dexler cannot reach the latch for the top gate, nor could he reach all the bags or trays in the top level.

Mr. Dexler would have fewer problems with the other conveyances, though he would still have some difficulty with tray carts and the large canvas carts. Tray carts are multi-leveled racks on wheels used to convey trays of mail. Though Mr. Dexler can just reach the top rack (which is 56 and ½ inches high) to slide trays on and off, he might tip some unstable trays, since he would be lifting them over his head and large pieces of mail sometimes extend above the edge of the tray. The same sort of difficulty might arise when Mr. Dexler unloads large canvas carts. In order to reach the trays at the bottom of the large canvas cart, Mr. Dexler must tip the cart on its side and stoop inside, which may dump some mail out of the trays.

Mr. Dexler's limited vertical and horizontal reach also would hinder his ability to perform at the sorting cases and post office boxes. He generally cannot reach the uppermost row of sorting slots or post office boxes,[6] and would have to move back and forth in front of a sorting case more than would a person with average horizontal reach. In addition, Mr. Dexler would be unable to participate in "passing" mail from several sorting stations because from those stations he would have to pass more

---

6. A report by Dr. Gross, an ergonomics expert retained by the Postal Service to analyze the duties of a distribution clerk, indicates that Mr. Dexler could do many of these sorting tasks. That report, however, is based on the assumption that Mr. Dexler has a vertical reach of 63 inches, an assumption proved incorrect by a demonstration in court which showed that Mr. Dexler's vertical reach is only 58 and 1/2 inches. The error in this assumption of almost five inches appears to be about the height of a sorting slot. The court's factual findings regarding what Mr. Dexler can reach are based on testimony, in-court demonstrations, and pictures of Mr. Dexler at the New Britain Post Office submitted as exhibits.

mail than he could fit in a stack along his short arm. The mail accumulates as it is passed down the row of sorting cases, with the sorting stations at the end of the row handling the largest amount of mail, which is often enough to stack along an average length arm.

## B. *Accommodations*

Several accommodations proposed as possible ways of dealing with these physical limitations will be considered in turn.

### 1. *A Step Stool*

Experts for Mr. Dexler testified that the use of a portable step stool would enable him to extend his reach to the height necessary to safely perform about 90 percent of the duties of a distribution clerk in the New Britain Post Office. Such a stool was displayed in the courtroom. It is about two feet wide and consists of two steps each with a rise of about eight inches and a depth of about eight inches. It also has wheels for portability that retract when a person steps on the stool. The cost of such a stool is around $300.

The use of a step stool would allow Mr. Dexler to reach the necessary heights to use BMCs and Post Cons, but, according to defendant's witnesses, would entail some safety risks and reduced productivity. The stool would pose a safety risk in two ways. First, Mr. Dexler would be somewhat unstable atop the stool because of his height and weight. There is a lot of activity and movement of equipment in the area where such conveyances would be loaded and unloaded, and, as a result, there is a risk that Mr. Dexler or his stool could be bumped, causing him to fall. Moreover, opening a rear door of a BMC would be particularly difficult, considering that the rear door (61″ x 71″) must be raised from the middle above an average person's head and held there until the safety pin is put into the corner hinge. Second, before and after the stool was used to open a conveyance, it might be an obstacle to others and might be difficult to see because of its height and because other workers are likely to be pushing large conveyances such as BMCs and Post Cons.

The use of a step stool would impair productivity because time would be required to move the stool into position. Even though this effect could be reduced by having several stools at different locations in the New Britain facility, it would still take time to move the stool to the proper position next to the conveyance, and then to move it out of the way.

The safety and productivity concerns of using a stool at the sorting cases are somewhat similar. Several injuries have been caused by conveyances bumping into stools against which clerks would lean to reduce fatigue at sorting cases. Such an accident might occur with Mr. Dexler standing on the step stool to reach the top row of slots. The use of a step stool also would impair productivity at the sorting cases. Since the stool is about half the width of a sorting case, it would frequently need to be moved for a particular slot to be reached.

Mr. Dexler's experience using a step stool for mail processing in the mailrooms of various private enterprises does not mitigate these safety and productivity concerns. The New Britain Post Office must process large volumes of mail in a relatively short period of time. The mailroom where Mr. Dexler currently works processes about 5,000 to 10,000 pieces of mail daily, while the New Britain office processes approximately 150,000 to 250,000 pieces of mail between 2:30 a.m. and 6:15 a.m. Although there are 48–55 clerks at the New Britain office as compared to 7 people in the mailroom where Mr. Dexler works, each post office clerk must still process more mail to a wider variety of areas than a clerk in a private mailroom. Moreover, processing in New Britain involves much more movement and a much greater use of large conveyances than does the course of processing in a private mailroom. Thus, the situation in New Britain with respect to safety and productivity is markedly different from the situation in a private mailroom.

### 2. A Platform

The use of a platform, which has been proposed as an alternative to a step stool, would have similar drawbacks. Although the cost of obtaining either a step stool or a platform would not be large, a platform would be less useful than a step stool in most respects because it would be more cumbersome to move. However, a platform would be more useful than a step stool at the sorting cases or at the post office boxes. Since it could be made wider and deeper than the step stool, it could reduce the number of times the device would have to be moved once Mr. Dexler was stationed at a sorting case. The platform would still have to be moved periodically, however, because as a distribution clerk in New Britain, Mr. Dexler would have to use various sorting cases. In addition, the post office box area is about 25 feet long, so a platform used for the sorting cases (which would be about four feet wide) would have to be moved frequently to allow Mr. Dexler to reach the top row of post office boxes along the entire length of the area. As a result of the need to move the platform, this accommodation would still impair productivity to some extent at the sorting stage.

### 3. Job Restructuring

Extending Mr. Dexler's reach through the use of a step stool or platform would not be enough to accommodate Mr. Dexler. There would also have to be some job restructuring. At the minimum, someone else would have to be assigned to unload trucks in his place. Such an accommodation was made in the New Britain Post Office for another clerk subsequent to the 1982 determination to not hire Mr. Dexler. A deaf distribution clerk, who could not safely unload trucks because she could not hear a warning if a piece of equipment went out of control, was hired in New Britain and accommodated by not having to load or unload trucks.

Restructuring also could be used to accommodate Mr. Dexler's limited ability to participate in other tasks. For example, Mr. Dexler's limited ability to participate in "passing" might be accommodated by assigning Mr. Dexler to the sorting cases that begin the passing of mail. Similarly, Mr. Dexler's limitations in loading and unloading conveyances might be accommodated by not assigning him to do those tasks or by assigning a taller person to assist him.

■ Though it is possible that the court could speculate about further restructuring that might overcome some of the limitations of the accommodations discussed above, Mr. Dexler has not proposed any such restructuring. As a result, the court is limited in its analysis to those accommodations considered above.[7]

### C. The Experience of Mr. Dietrich

The testimony of Mr. Darrel Dietrich, a pituitary dwarf employed by the Postal Service, is relied upon by Mr. Dexler as support for his argument that he could be accommodated. Pituitary dwarfism is a condition where the growth of the individual is abnormally slow due to a disorder of the pituitary gland. Because of this slow growth, a pituitary dwarf, like an achondroplastic dwarf, is short in stature. However, unlike an achondroplastic dwarf, a pituitary dwarf's limbs are in normal proportion to his trunk. Mr. Dietrich is five feet tall, and both his horizontal and vertical reach are greater than that of Mr. Dexler.

When Mr. Dietrich first interviewed with the Postal Service, the postmaster was skeptical about his ability to do the work, but Mr. Dietrich proved to be an able employee, eventually working up the ranks to the position of postmaster in a small post

---

7. The court notes that if more pervasive restructuring were considered, it might run afoul of the collective bargaining agreement, which requires that newly established duty assignments be bid on and allocated according to seniority. While the collective bargaining agreement can- not override federal law regarding the employment of the handicapped, its provisions are factors to consider in analyzing the reasonableness of a proposed accommodation. *See Bey v. Bolger*, 540 F.Supp. 910, 926–27 (E.D.Pa.1982).

office. Mr. Dietrich worked for some time as a distribution clerk in the Fresno Post Office. That office is a sectional office like the Hartford Post Office. It apparently used an assembly-line system because Mr. Dietrich performed the task of dumping mail on a conveyor belt. In that position, Mr. Dietrich successfully performed various tasks including dumping mail, sorting mail at cases, moving sacks of mail, and pushing canvas carts. However, Mr. Dietrich did not work as a distribution clerk in an associate post office. As a result, he does not have experience in a position similar to the one sought by Mr. Dexler at the New Britain Post Office.

### Discussion

Mr. Dexler sued under sections 501, 504 and 505 of the Rehabilitation Act of 1973, as amended, 29 U.S.C. §§ 791, 794 and 794a. These provisions establish two legal theories under which he might recover. Because section 504 of the Act provides relief in more limited circumstances, the theory under that provision will be considered first.

### I. *Section 504 of the Act*

Section 504 of the Rehabilitation Act states in relevant part:

No otherwise qualified handicapped individual in the United States, as defined in section 706(7) of this title, shall, solely by reason of his handicap, be excluded from the participation in, be denied the benefits of, or be subjected to discrimination under ... any program or activity conducted by ... the United States Postal Service.

29 U.S.C. § 794. A private right of action under this provision was provided for in section 505 of the Act, 29 U.S.C. § 794a.

To make out a case under these provisions, Mr. Dexler must prove (1) that he is a "handicapped person" under the Act, (2) that he is "otherwise qualified" for the position sought, (3) that he was excluded from the position "solely by reason of his handicap," and (4) that the position was part of a program or activity of the Postal Service. *See Joyner by Lowry v. Dumpson*, 712 F.2d 770, 774 (2d Cir.1983); *Doe v. New York University*, 666 F.2d 761, 774 (2d Cir.1981). To be "otherwise qualified" under this provision, Mr. Dexler must "meet all of a program's requirements in spite of his handicap." *Southeastern Community College v. Davis*, 442 U.S. 397, 406, 99 S.Ct. 2361, 2367, 60 L.Ed.2d 980 (1979); *Doe*, 666 F.2d at 775.[8] If Mr. Dexler shows that he is a handicapped person under the Act, that he was qualified for the job apart from his handicap, and that he was denied the job, he has made out a prima facie case, and the burden shifts to the government to rebut the inference that the handicap was improperly taken into account by showing that the handicap is relevant to qualifications for the position sought. *Doe*, 666 F.2d at 776.

The facts of this case demonstrate that Mr. Dexler made out a prima facie case. The government stipulated to the fact that Dexler is a handicapped person within the meaning of the Act. With his education and experience, he was qualified for the job as a distribution clerk, apart from the physical limitations of his handicap. There is no dispute that he was denied the job.

Even though Mr. Dexler met this initial burden, the evidence is persuasive that his handicap is relevant to his qualifications for the position he sought. The evidence shows that Mr. Dexler's short

8. There is authority indicating that in some situations discrimination under section 504 "may" include the failure to make reasonable accommodations. *See Alexander v. Choate*, 469 U.S. 287, 105 S.Ct. 712, 720–21 & n. 20, 83 L.Ed.2d 661 (1985) (discussing *Southeastern Community College v. Davis*, 442 U.S. 397, 99 S.Ct. 2361, 60 L.Ed.2d 980 (1979)). However, this is not one of those situations. The reasonable accommodation analysis in this case is to be done under section 501, 29 U.S.C. § 791, which requires the

Postal Service to adopt an "affirmative action program" for handicapped individuals. *See Davis*, 442 U.S. at 410–11, 99 S.Ct. at 2369 (section 501 distinguished from section 504 in that it provides for "affirmative efforts to overcome disabilities," while section 504 deals with "the evenhanded treatment" of handicapped persons). The analysis of reasonable accommodation is considered in the next section of the opinion.

stature and limited reach made him unqualified for the distribution clerk position in the New Britain Post Office because he would be unable to do many of the tasks required in that position. Those tasks are detailed above. *See supra* at 1422–23. Thus, Mr. Dexler is not qualified for the job in spite of his handicap.

A similar result was reached in *Carmi v. Metropolitan St. Louis Sewer Dist.*, 471 F.Supp. 119 (E.D.Mo.1979), *aff'd on other grounds*, 620 F.2d 672 (8th Cir.), *cert. denied*, 449 U.S. 892, 101 S.Ct. 249, 66 L.Ed.2d 117 (1980). In that case, the plaintiff claimed that he had been denied a job as a "storekeeper" because of his handicap. He suffered muscle and nerve deterioration and atrophy in the muscles of the hands and dorsiflexors of the feet, a rare hereditary condition known as Progressive Peroneal Atrophy. That condition caused him to have a marked weakness of grip in both hands, and led the defendant's doctor to conclude that plaintiff was incapable of lifting items weighing 60 pounds on a regular basis. Relying on this opinion, the defendant refused to hire plaintiff because the job he sought required a considerable amount of lifting heavy objects. The court found this reliance reasonable, and ruled that plaintiff's complaint under the Rehabilitation Act must be dismissed because his handicap prevented him from being qualified for the job. *Id.* at 121–22. *Accord Simon v. St. Louis County*, 735 F.2d 1082 (8th Cir.1984) (paraplegic not qualified to be a commissioned police officer because he would be unable to perform forceful arrest and transfer duties of the job); *Daubert v. United States Postal Serv.*, 733 F.2d 1367 (10th Cir.1984) (employee not qualified for distribution clerk-machine trainee position because back problems prevented her from doing the job for long periods of time).

## II. *Section 501 of the Act*

Even though Mr. Dexler is not qualified for the distribution clerk position in spite of his handicap, he might still be entitled to the job under section 501 of the Act if reasonable accommodations could be made for him. Section 501(b) of the Rehabilitation Act provides that the Postal Service must implement an affirmative action program, approved by the Civil Service Commission, "to provide adequate hiring, placement and advancement opportunities for handicapped individuals." 29 U.S.C. § 791(b). Mr. Dexler is entitled to bring suit for any complaint under this provision. 29 U.S.C. § 794a.

### A. *Reasonable Accommodation*

According to Postal Service regulations, this provision will be complied with by "implementing regulations promulgated by the Equal Employment Opportunity Commission." 39 C.F.R. § 255.1(d) (1986). The EEOC regulations require the Postal Service to "make reasonable accommodation to the known physical or mental limitations of a qualified handicapped applicant or employee" unless the Postal Service demonstrates that "accommodation would impose an undue hardship." 29 C.F.R. § 1613.-704(a) (1986).

No standard for determining the reasonableness of an accommodation has been formulated.[9] EEOC regulations, however, identify various factors to be considered in evaluating proposed accommodations. They point out that:

> Reasonable accommodation may include, but shall not be limited to: (1) Making facilities readily accessible to and usable by handicapped persons, and (2) job restructuring, part-time or modified work schedules, acquisition or modification of equipment or devices, appropriate adjustment or modification of examinations, the provision of readers and interpreters, and other similar actions.

*Id.* § 1613.704(b). In determining whether such accommodations impose an undue hardship on the Postal Service,

> factors to be considered include: (1) The overall size of the agency's program with respect to the number of employees,

**9.** An established standard of reasonable care does exist in the law, *see* Restatement (Second) of Torts § 283 (reasonable care is that "of a reasonable man under like circumstances"), but that standard is not helpful in the present context.

number and type of facilities and size of budget; (2) the type of agency operation, including the composition and structure of the agency's work force; and (3) the nature and the cost of the accommodation.

*Id.* § 1613.704(c). From these factors, it appears that under a liberal interpretation, "reasonable accommodation" is one that would not interfere unduly with the Postal Service's operation.

■ Accommodation need only be made for qualified handicapped applicants. A qualified handicapped applicant is one

who, with or without reasonable accommodation, can perform the essential functions of the position in question without endangering the health and safety of the individual or others and who, depending upon the type of appointing authority being used: (1) Meets the experience and/or education requirements (which may include passing a written test) of the position in question, or (2) meets the criteria for appointment under one of the special appointing authorities for handicapped persons.

*Id.* § 1613.702(f).

The Postal Service Personnel Manual in effect at the time Mr. Dexler was considered for the New Britain job is consistent with these regulations, but does not provide any additional standards or factors to be considered in evaluating the proposed accommodations. *See* Plaintiff's Exhibit 29.[10]

■ For a plaintiff to make out a prima facie case under section 501 and its regulatory provisions, as well as the case law interpreting them, the plaintiff must prove: (1) that he is a handicapped person within the meaning of the Act; (2) that he applied for and was denied a job under a section 501 program; (3) that he was qualified for the job except for his handicap; and (4) that, at least as a facial matter, he can perform the essential functions of the posi-

tion with reasonable accommodation without endangering the health or safety of himself or others. Once the plaintiff has established a prima facie case, the burden of proof shifts to the defendant to show that the suggested accommodations would impose an undue hardship on the operation of its program. *See Gardner v. Morris,* 752 F.2d 1271, 1279–81 (8th Cir.1985); *Treadwell v. Alexander,* 707 F.2d 473, 475 (11th Cir.1983); *Prewitt v. United States Postal Serv.,* 662 F.2d 292, 308–10 (5th Cir.1981); *Bey v. Bolger,* 540 F.Supp. 910, 924–25 (E.D.Pa.1982).

### B. *Assessment of the Factors*

The crux of this inquiry is whether the Postal Service can make reasonable accommodation for Mr. Dexler's condition. There is no dispute that he is a handicapped person within the meaning of the Rehabilitation Act, that he applied for the New Britain distribution clerk position under the Postal Service program for the severely handicapped but was not hired, and that he was qualified for the position except for his handicap. In addition, Mr. Dexler made the necessary facial showing, through the testimony of vocational rehabilitation experts, that he could be safely accommodated by the use of a step stool and/or platform and by some job restructuring. Mr. Dexler therefore met his burden of establishing a prima facie case under section 501.

■ However, evidence from witnesses intimately familiar with the operation of the New Britain and similar postal facilities shows that the suggested accommodations would impose an undue hardship on the Postal Service. Two factors identified by the regulations, the type of operation and the nature and cost of the accommodations, 29 C.F.R. § 1613.704(c)(2)–(3), are implicated.

### 1. *Type of Operation*

As an affiliate post office, the New Britain facility must process large quantities of

---

10. The parties have relied to some extent on a Postal Bulletin revising the provisions of this handbook. Plaintiff's Exhibit 34. Even though this bulletin provides some additional insight into the current Postal Service program for the handicapped, it does not apply to Mr. Dexler's claim because it is dated February 2, 1984, well after Mr. Dexler was denied the New Britain job.

mail in accordance with strict scheduling deadlines. In order to do so, the facility uses a "task oriented" approach that requires its distribution clerks to do many different tasks. The flow of mail into the office does not allow an assembly-line operation with each clerk doing a specific task.

Various accommodations for Mr. Dexler would create an undue hardship for the type of operation at the New Britain Post Office. For example, one possible accommodation for Mr. Dexler is to not assign him to do various tasks normally assigned to distribution clerks. However, because of the type of operation, such an accommodation would often leave Mr. Dexler without work to do, which would be an undue hardship. *See Bey v. Bolger*, 540 F.Supp. 910, 927 (E.D.Pa.1982) (permanent assignment of handicapped person to light duty status in post office would be an undue hardship because, among other things, there was a limited amount of such work available). Alternatively, Mr. Dexler might be accommodated by having a taller person available to assist him in doing certain tasks such as loading and unloading BMCs and Post Cons. This accommodation would also create an undue hardship because it would require "doubling up" on various tasks. *See Treadwell v. Alexander*, 707 F.2d 473, 478 (11th Cir.1983).

### 2. *Nature and Costs of Accommodation*

Although these hardships may be minimized by Mr. Dexler's use of a step stool or platform to perform various tasks,[11] the nature and costs of that accommodation also make it an undue hardship. Specifically, the use of stool or platform is not a reasonable accommodation because of the safety problems and the loss of efficiency. The evidence shows that the use of somewhat similar equipment led to serious injuries in a number of cases in the past. This evidence, combined with evidence regarding the workplace environment at the New Britain Post Office and the physical dimensions of the equipment and of Mr. Dexler, persuade the court that the use of these devices would create a significant risk of injury to Mr. Dexler or to others.[12]

Moreover, the cost of this accommodation in terms of lost efficiency also would make it an undue hardship. While the actual cost of the devices would not be large, there is substantial evidence that Mr. Dexler's efficiency while using them would be substantially lower than that of an average-sized clerk. Extra time would be required to move the devices from place to place and for Mr. Dexler to repeatedly step up and step down in using them. Such a significant loss of efficiency is not required as part of reasonable accommodation under the Rehabilitation Act. *See Bey*, 540 F.Supp. at 927 (employer not required to adopt an accommodation that would reduce efficiency to an unacceptable level); *see also* 124 Cong.Rec. 30,323 (1978) (Statement of Sen. Williams during debate on proposed amendments to the Rehabilitation

**11.** There are some tasks that Mr. Dexler may not be able to do even with the aid of a step stool or platform such as opening the rear door of a BMC. That door is to be lifted above a person's head and held ajar from the middle while a safety pin is inserted in the corner hinge. Since the door is about five feet wide and almost six feet high, it is unlikely that Dexler could perform this task because of his limited horizontal reach, even if he had the aid of a step stool to extend his vertical reach.

**12.** The regulations define a "qualified handicapped employee" as one that "can perform the essential functions of the position in question without endangering the health and safety of the individual or others." 29 C.F.R. § 1613.-701(f). Therefore, a court might find certain health and safety risks make the handicapped person unqualified. To do so, however, the court would have to decide whether the health and safety risk created by the accommodation was severe enough to find the handicapped person unqualified. *See Mantolete v. Bolger*, 767 F.2d 1416, 1422 (9th Cir.1985) (holding that a handicapped individual is not qualified because of health and safety concerns only on "a showing of reasonable probability of substantial harm"). Since the proposed accommodations would create an undue hardship on the defendant for the reasons discussed in the text, the court need not decide whether the health and safety risks created by accommodating Mr. Dexler are severe enough to justify finding that he is not a qualified handicapped employee.

Act) ("All authorities interpreting current law have clearly understood that handicapped individuals can be held to the same performance standards that an employer demands of all employees.").

In sum, Mr. Dexler's condition cannot be reasonably accommodated for the distribution clerk position at the New Britain Post Office.[13] The various possible accommodations each involve hardships for the Postal Service. While none of these hardships is conclusive or overwhelming, taken together they demonstrate that accommodating Mr. Dexler would unduly interfere with the operation of the New Britain Post Office.

### Conclusion

For the foregoing reasons, judgment is to be entered in favor of the defendant. Mr. Dexler's claim under section 504 of the Rehabilitation Act fails because he is not an otherwise qualified handicapped individual. That is, he could not perform the essential functions of the position in question in spite of his handicap. His claim under section 501 of the Act also fails because his condition cannot be reasonably accommodated. The various possible accommodations would impose undue hardships on the Postal Service in the form of health and safety risks and inefficiency.

The foregoing constitutes the court's findings of fact and conclusions of law pursuant to Rule 52 of the Federal Rules of Civil Procedure.

SO ORDERED.

---

**13.** The experience of Mr. Dietrich, the pituitary dwarf who worked as a distribution clerk in Fresno, California, does not refute the evidence of hardship introduced by the defendant. As discussed *supra* at 1424–25, Mr. Dietrich's distribution clerk position was quite different from the position at the New Britain Post Office.