**Vaile F. WALDERS, Plaintiff,**

v.

**H. Lawrence GARRETT, III, Secretary of the Navy, Defendant.**

**Civ. A. No. 90–785–A.**

United States District Court,
E.D. Virginia,
Alexandria Division.

June 12, 1991.

June D.W. Kalijarvi, Kalijarvi, Chuzi & Stetina, P.C., Washington, D.C., for plaintiff.

Hudson, Henry Edward, U.S. Atty., Alexandria, Va., Dennis Szybala, Asst. U.S. Atty., Anne N. Brennan, Asst. Counsel, Naval Sea Systems Command, for defendant.

## MEMORANDUM OPINION

ELLIS, District Judge.

This is a handicap discrimination action under § 501 of the Rehabilitation Act of 1973, 29 U.S.C. § 791 (the "Act"). Plaintiff, a former civilian employee of the Navy, alleges that the government violated the Act by terminating her employment and failing to offer reasonable accommodation for her handicapping condition, Chronic Fatigue Immune Dysfunction Syndrome ("CFIDS"). The matter came before the Court for a bench trial. In the course of the trial, numerous documents were admitted into the record and the Court heard the testimony of eight witnesses, including plaintiff, her former physician, her immediate supervisor and two higher level supervisors. For the reasons recorded here,[1] the Court concludes that plaintiff is not a "qualified handicapped employee" within the meaning of the Act. Accordingly, judgment in favor of the defendant is warranted.

### FACTS

Plaintiff was employed by the Naval Sea Systems Command ("NAVSEA") from December 1984 until her removal on August 18, 1989. She worked first as a librarian and was reassigned in 1987 to a Freedom of Information Assistant position, level GS-7, in the Freedom of Information and Privacy Act Branch (the "Branch"). This Branch was responsible for processing and responding to requests for documents under the Freedom of Information Act ("FOIA"), 5 U.S.C. § 552, and the Privacy Act, 5 U.S.C. § 552a.

The quality of plaintiff's work is not in dispute. The evidence confirms that when she was present, plaintiff was an effective worker who satisfied her job requirements. The problem arises, as will become evident, from the frequency and unpredictability of her absences from work.

Between October 1988 and August 1989, the Branch consisted of fewer than 15 em-

---

1. This opinion constitutes the Court's findings of fact and conclusions of law purusuant to Rule 52, Fed.R.Civ.P.

ployees. Supervisor Judy Wise was responsible for overall office management. The staff was divided into three teams. Plaintiff's team consisted of five employees (four full time and one part-time) and was responsible for processing routine FOIA requests and a variety of essentially administrative tasks. Plaintiff's principal duty was to prepare responses to FOIA requests for certain types of delivery orders and technical documents. Also included among her duties were keeping track of office productivity statistics, taking the lead in preparation of the Branch's annual report to Congress, and maintaining the freedom of information library.

During plaintiff's tenure, the Branch operated under certain statutory deadlines [2] and was struggling with a substantial backlog of requests as well as a degree of judicial scrutiny resulting from FOIA suits challenging the Branch's failure to process requests in a timely manner.[3] Both Wise and Earl Wright, plaintiff's second level supervisor, testified emphatically to the need for rapid processing and closing of cases and the substantial pressure placed

on the Branch by the Navy and, in some instances, by the Department of Justice. Both also testified that they sought increases in staff and support for the Branch. These requests, they reported, fell victim to federal budgetary and personnel constraints.

In early August 1988, Dr. Robert Hallowitz diagnosed plaintiff as having CFIDS.[4] The disease appears to be a dysfunction of the immune system that results in chronic viral activity, extreme fatigue, and other symptoms.[5] In plaintiff's case, as with other CFIDS sufferers, the disease strikes unpredictably. When it is active, plaintiff may be totally debilitated (i.e., unable to get out of bed) or may experience less severe symptoms such as headaches, sore throat, or low grade fever. When the disease is dormant, plaintiff experiences few, if any, symptoms and can function normally.

Plaintiff's tenure at NAVSEA was consistently marked by a high rate of absenteeism. The parties stipulated that during each of the calendar years 1985 through 1988 plaintiff was absent from work, ex-

**2.** For example, FOIA requires federal agencies and organizations, including NAVSEA, to respond to initial requests for information within ten days and to meet additional deadline and notice requirements thereafter. *See* 5 U.S.C. § 552(a)(6).

**3.** The record reflects that in many instances the Branch was unable to respond substantively to FOIA requests within the statutory ten day period and therefore often had to issue "technical denial letters." Wise also testified that the Branch was under court order in several FOIA cases to process requests by a date certain and to inform the court periodically of its progress in reducing the backlog of unresolved information requests.

**4.** The Navy stipulated that plaintiff is handicapped within the meaning of the Act. Despite this, the government throughout this litigation has not concealed its skepticism concerning whether plaintiff in fact has CFIDS. For example, the government referred to the fact that plaintiff was examined for this lawsuit by Dr. Gaetano Molinari, who concluded that he found insufficient objective criteria to support a CFIDS diagnosis, although he conceded that plaintiff may well have the disease. Dr. Molinari did not testify at trial. In any event, the government's stipulation that plaintiff is handi-

capped under the Act renders its skepticism irrelevant. Moreover, Dr. Hallowitz testified that he examined the plaintiff and performed a series of tests to rule out potential causes of her symptoms other than CFIDS. While the government painted Dr. Hallowitz as somewhat of an advocate for CFIDS sufferers, the Court concludes that he is knowledgeable about the condition and there is no reason to doubt his diagnosis in this case.

**5.** CFIDS, also sometimes referred to as Chronic Fatigue Syndrome or Epstein–Barr Virus, is of uncertain etiology. Dr. Hallowitz testified that the symptoms associated with the syndrome are aggravated by stress and that there is as yet no generally accepted and effective cure. It is not entirely clear whether CFIDS is a single disease or a complex of potentially related symptoms that tend to occur together and may have multiple causes. *See* Holmes, et al., Chronic Fatigue Syndrome: A Working Case Definition, 108 Annals Internal Med. 387–89 (1988). In any event, CFIDS has received increasing attention in the medical community and is indisputably capable of causing severely debilitating effects. *See* The CFIDS Assoc., Chronic Fatigue and Immune Dysfunction Syndrome Patient Guide (Nov. 30, 1988); Straus, et al., Persisting Illness and Fatigue in Adults with Evidence of Epstein–Barr Virus Infection, 102(1) Annals Internal Med. 7–16 (1985).

cluding vacation and sick leave,[6] for more than four weeks per year.[7] Also stipulated was her attendance record for the first half of 1989, when she was absent from work in a non-pay status for more than 100 hours. Similarly, Wise testified that according to her contemporaneously-maintained records, plaintiff was absent, excluding annual and sick leave, for (i) all or part of thirty-two days for the four-month period September 1988 through the end of the year, and (ii) for all or part of thirty days between March and August 1989. In sum, plaintiff's rate of absenteeism was substantial and fairly constant; including the annual and sick leave which she almost invariably exhausted, plaintiff missed work for all or part of more than sixty days per year, and probably much closer to 90 days. On the basis of this history, the Court finds that a similar rate of absenteeism for plaintiff would likely occur in the future.[8] Consistent with this expectation, Dr. Hallowitz testified that once CFIDS has persisted for three years, "the probability of it going into a complete spontaneous remission is virtually nil." He further testified that "[t]he pattern seems to be that patients will hover somewhere around the 50 percent or 60 percent of their former vitality, with waxing and waning course[s] of exacerbation and remissions."[9]

In November 1988, plaintiff applied for a transfer of leave for the purpose of entering a hospital for treatment of multiple viral infections related to her condition. The Navy subsequently permitted plaintiff to use a combination of donated leave,[10] leave without pay, and accrued leave to cover her period of hospitalization from January 9 to February 21, 1989. The Navy also extended plaintiff's period of leave by two weeks at the request of her physician. Before plaintiff entered the hospital, the Navy issued her a letter of leave restriction stating that she would be permitted to use annual and sick leave to cover periods of unscheduled absence, but would be charged as Absent Without Leave (AWOL) for any unscheduled absence for which she lacked accrued leave.[11]

6. The record reflects that plaintiff earned approximately thirty-three days of leave per year, consisting of twenty days annual leave and thirteen days sick leave.

7. When plaintiff received reprimands for poor attendance in 1986 and 1987, she filed Equal Employment Opportunity complaints in October 1986 and April 1987 in which she alleged discrimination with respect to the reprimands. The Navy settled these complaints with plaintiff in June 1988. In exchange for withdrawal of the complaints, the Navy agreed to expunge plaintiff's record of references to discipline, cancel a suspension, and pay certain medical expenses and attorney fees.

8. Plaintiff testified that she has felt comparatively well over the past year. During much of that time, however, she was not working. Accordingly, in light of plaintiff's relatively consistent work history of more than four years, the Court is not persuaded that her illness-related absenteeism is likely to abate, particularly when plaintiff must occupy a full-time position subject to pressures similar to those at NAVSEA.

9. The Navy does not dispute that plaintiff experienced symptoms consistent with CFIDS before she was diagnosed as having the illness in 1988. Nor does the Navy dispute that plaintiff's history of absenteeism is causally related to her illness. Yet the Navy does contend that some of plaintiff's absences were due as much to her own behavior as to CFIDS. In this respect, plaintiff's co-worker Stephanie Carr testified that plaintiff made statements to the effect that she routinely watched late night television, did not intend to follow medical advice, and sought to exploit her illness to obtain time off. Wise also testified that plaintiff voiced objections to medical advice she received from a sleep disorder clinic and food allergist, trumpeted her disregard of that advice, and stated that she, plaintiff, did not understand why anyone should report to work unless he or she was completely healthy. Plaintiff denied making such statements. Resolution of these disputes is unnecessary to the disposition of this matter, given the parties' stipulation that plaintiff is a handicapped person and in light of the essentially undisputed evidence concerning plaintiff's attendance record and the essential duties of her job.

10. NAVSEA's transfer or donated leave program permits employees to donate their unused leave balances to other employees in need of additional leave.

11. Plaintiff testified that she considered the leave restrictions punitive and stressful. Wise testified that while the letter served in part as a disciplinary measure, it also permitted plaintiff to apply her annual leave to future absences, something plaintiff had not been permitted to do under previous restrictions. More specifically, from October 1987 through June 1988 plain-

When plaintiff returned from the hospital her work attendance temporarily improved. Subsequently, however, her absenteeism again increased to at least the pre-hospitalization level. During this period, the parties discussed appropriate accommodations for plaintiff, even though the Navy was not then formally treating plaintiff as a handicapped person. On one hand, Wise told plaintiff that further leave without pay would not be granted, that non-emergency sick leave must be scheduled in advance, and that future unscheduled absences not covered by available leave would be charged as AWOL. Yet, the Navy also offered plaintiff the option of working on weekends or her compressed day off [12] to accumulate compensatory time for future absences.[13] Beyond this, Wright testified that he searched unsuccessfully within NAVSEA for a position better suited to plaintiff's needs.[14] Plaintiff apparently rejected the Navy's offer and requested instead that she be permitted to work weekends or compressed days off at the overtime rate, a proposal the Navy rejected. Plaintiff also testified that she requested donated leave, although Wise testified that she received no such request.[15]

Between April 6 and June 2, 1989, plaintiff was charged as AWOL for fifteen days. On June 1, 1989, Wise provided plaintiff with a written request for specific medical information for the purpose of determining whether "you are able to perform your assigned duties on a full-time basis, if you are a handicapped employee, or if I must initiate action to remove you from your position for unavailability for full-time duty." Wise also offered to refer plaintiff, at her option, for a fitness for duty examination. In a June 6 written response, plaintiff, in lieu of the requested information,[16] offered instead an explana-

tiff was permitted to use sick and annual leave to cover health-related absences until those leave balances were exhausted. From June 30, 1988 to January 6, 1989, she was not permitted to use annual leave for sick absences. Considering all the testimony, the Court finds that the letter embodied both a disciplinary purpose and an element of encouragement or accommodation.

**12.** During her tenure in the Branch, plaintiff worked on the compressed schedule utilized by several federal agencies. Under this system, an employee is scheduled to work eight nine-hour days and one eight-hour day in each two week pay period. The remaining work day of the pay period is a "day off."

**13.** The Navy did not, however, offer to permit plaintiff to apply compensatory time to make up for past absences. Wise and Wright testified that to do so would have contravened internal Navy regulations prohibiting the use of compensatory time before it is earned.

**14.** More particularly, Wright testified that aside from a position in the NAVSEA library, he was unable to find a position appropriate for plaintiff's grade level. With respect to the library position, Wise testified that for a time the library objected to plaintiff's return. Following her period of hospitalization, however, the library seemed to be willing to trade one of its employees for plaintiff. Wise testified, however, that plaintiff objected to any transfer.

**15.** Wise forthrightly admitted that, under the circumstances then prevailing, plaintiff's request for donated leave most likely would have been denied. Yet Wise also testified that she permitted plaintiff to use a block of donated hours shortly before plaintiff's termination, even though these hours apparently were never requested.

**16.** Wise and Tittle testified that prior to the removal period they knew plaintiff had a general history of medical complaints, but they were never informed that she had CFIDS or provided specific medical information. Plaintiff contends that she provided notice and information regarding her condition soon after the diagnosis. The pre-termination record reflects the following: 1) a November 7, 1986 letter from Dr. Gary W. London stating that plaintiff suffers from cervical and cranial muscle spasms and migraine headaches; 2) a June 2, 1988 statement from Dr. Ralph M. Coan stating that plaintiff suffers from migraine headaches; 3) an October 14, 1988 letter from Dr. Hallowitz stating that plaintiff "has been under my care since July 1988 and is being treated for chronic fatigue syndrome and severe migraine headaches"; 4) a November 2, 1988 letter from Dr. Hallowitz stating that "[i]t is medically advised that [plaintiff] be hospitalized ... for treatment of multiple viral infections"; 5) plaintiff's leave transfer request of November 9, 1988 stating that "I have recently been diagnosed with a longstanding, chronic, on-going illness"; 6) a February 16, 1989 letter from Dr. Joseph L. Burgos stating that plaintiff required an extended period of hospitalization; 7) a July 8, 1989 letter from Dr. Hallowitz responding to the Navy's request for information and explaining in detail plaintiff's CFIDS condition. The

tion for the deterioration in her attendance record. Plaintiff attributed the initial improvement in her attendance to medication prescribed for her during the course of her hospitalization and stated that her recent difficulties were the result of exhausting the supply of medication. Plaintiff requested an opportunity to demonstrate that she could improve her attendance and maintain a full-time position once she resumed taking the medication. By memorandum to plaintiff dated June 7, 1989, Wise reiterated her request for medical information to determine whether plaintiff could continue to perform her duties. By letter dated June 26, 1989, Wright proposed plaintiff's removal. He testified that plaintiff's continued absenteeism compelled him to conclude that plaintiff could not be relied upon to maintain a regular, full-time work schedule, citing the fifteen days of AWOL. Approximately a month later, plaintiff replied orally to Charles Tittle, her third level supervisor and the deciding official. In this oral reply, plaintiff advised Tittle that she had received helpful medication during her hospitalization, but had discontinued taking it because of cost and other factors. She stated that she had reinitiated the medication on June 23, 1989, and that her single day of absence since June 6 showed that she could improve her attendance while on the medication.

Tittle testified that he planned to render his final decision within about two weeks of plaintiff's oral reply. During this two-week period, plaintiff was absent on an unscheduled basis on July 31, August 1, and August 7, 1989. Tittle testified that these absences served as the final straw. They demonstrated, in his view, that there was no realistic prospect for future improvement. As a result, on August 9 he ordered plaintiff's removal, effective August 18, based on her unavailability for full-time work.

Plaintiff appealed her removal to the Merit Systems Protection Board. The Administrative Judge sustained the Navy's action, finding that plaintiff was not a "qualified handicapped person" under the Act. Plaintiff then petitioned for review to the Equal Employment Opportunity Commission, which found that she was a qualified handicapped employee, but that her removal was proper because the only accommodation she would accept was not reasonable.

## ANALYSIS

█ Analysis under the Rehabilitation Act is well established. The shifting burden of persuasion scheme is modeled after the anti-discrimination provisions of Title VII. *See* 29 U.S.C. § 794a(a)(1) (providing cause of action under Title VII); *Pushkin v. Regents of University of Colorado*, 658 F.2d 1372 (10th Cir.1981). First, plaintiff must demonstrate that she is "handicapped" within the meaning of the Act and pertinent regulations. *See Jasany v. USPS*, 755 F.2d 1244, 1248 (6th Cir.1985). Second, plaintiff must demonstrate that she is "otherwise qualified" for the position at issue, see 29 C.F.R. § 1613.702(f); *Jasany; Fields v. Lyng*, 705 F.Supp. 1134 (D.Md.1988), *aff'd*, 888 F.2d 1385 (4th Cir. 1989) (table affirmance), and that she was excluded or discharged from the position solely because of that handicap. *See Reynolds v. Brock*, 815 F.2d 571, 574 (9th Cir. 1987); *Doe v. New York University*, 666 F.2d 761 (2d Cir.1981); *Matzo v. Postmaster General*, 685 F.Supp. 260 (D.D.C.), *aff'd*, 861 F.2d 1290 (D.C.Cir.1987) (table affirmance). These two showings constitute the prima facie case. *See Prewitt v. USPS*, 662 F.2d 292 (5th Cir. Unit A 1981); *Langon v. U.S. Dept. of Health and Human Services*, 749 F.Supp. 1 (D.D.C.1990). Third, if plaintiff satisfies her burden of demonstrating qualification under the Act, the burden shifts to defendant to show that the justifications offered for its refusal to accommodate plaintiff are "job related" and that to make the necessary accommodation would impose an "undue hardship" on its operations. *See Prewitt*, 662 F.2d at

record thus indicates that prior to the termination period of June–August 1989, only Dr. Hallowitz's brief letter of October 14, 1988 mentioned CFIDS, and this letter merely described plaintiff's symptoms and recommended a reduction of stress.

310; *Langon*, 749 F.Supp. at 5; 29 C.F.R. § 1613.704(a).

## A. Handicap

■ The Act defines a handicapped person as one who "(1) [h]as a physical ... impairment which substantially limits one or more of such person's major life activities, (2) has a record of such an impairment, or (3) is regarded as having such an impairment." 29 U.S.C. § 706(7)(B); 29 C.F.R. § 1613.702(a). A major life activity is defined by regulation to include functions such as "caring for one's self, performing manual tasks, walking, seeing, hearing, speaking, breathing, learning, and working." 34 C.F.R. § 104.3(j)(2)(ii); 29 C.F.R. § 1613.702(c).

CFIDS plainly fits this definition of a handicap. Indeed, at trial, the Navy stipulated that plaintiff is a handicapped employee.[17] Accordingly, plaintiff has satisfied this element of the analysis.

## B. Qualified Handicapped Person

■ A qualified handicapped employee is one who can, "with or without reasonable accommodation, perform the essential functions of the position in question." 29 C.F.R. § 1613.702(f). Such a person is "one who is able to meet all of a program's requirements in spite of his handicap." *Southeastern Community College v. Davis*, 442 U.S. 397, 406, 99 S.Ct. 2361, 2367, 60 L.Ed.2d 980 (1979). In the context of this case, the dispositive issues are (i) whether reasonably regular attendance was an essential function of plaintiff's position, and (ii) whether plaintiff could maintain such attendance with or without reasonable accommodation.

### 1. Regular Attendance as an Essential Job Function

The Navy's position, distilled to its essence, is that reasonably regular, predictable attendance was an essential requirement of plaintiff's work. Without such attendance, the Navy claims, plaintiff could not accomplish her essential job functions at the required productivity level. This claim is persuasive. It is self-evident that while perfect attendance is not a necessary element of all jobs, reasonably regular and predictable attendance is necessary for many. Few would dispute that, in general, employees cannot perform their jobs successfully without meeting some threshhold of both attendance and regularity. The weight of authority supports this common-

---

**17.** The Navy also took this position in the administrative proceedings below, arguing that plaintiff's supervisors regarded her as handicapped whether or not plaintiff had CFIDS. At summary judgment in this action, however, the Navy argued that plaintiff is not handicapped within the meaning of the Act because her affliction is merely a chronic illness, relying on *Santiago v. Temple University*, 739 F.Supp. 974 (E.D.Pa.1990). In that case the plaintiff suffered from some vision loss in one eye and experienced intermittent eye inflammation that prevented predictable work attendance. The *Santiago* court refused to characterize the ailment as a handicap, stating that if it did so it would then be compelled to find all chronic illnesses that disrupt a regular work schedule, whether permanent or transitory, to be handicaps.

The *Santiago* reasoning is not controlling on this point. To begin with, the facts of that case are inapposite. The eye inflammation did not physically prevent the employee from coming to work or from seeing: he was not blinded by the malady. By contrast, when CFIDS strikes plaintiff, she may be completely debilitated—*e.g.*, she cannot come to work or even get out of bed. During these episodes, she also requires greater than normal amounts of sleep. CFIDS thus impairs, albeit not on a consistent basis, a person's major functions including walking, dressing, and, in particular, working. Second, to the extent that *Santiago* suggests that no chronic illness may constitute a handicap, it seems inconsistent with the Act. See 29 C.F.R. § 1613.702(b) (defining "physical or mental impairment" as "any physiological disorder or condition" affecting one or more body systems); *id.* § 1613.702(e) (specifying that a person not actually impaired or only minimally impaired may still be handicapped because the employer treats the person as impaired); *see also School Board of Nassau County, Fla. v. Arline*, 480 U.S. 273, 281, 107 S.Ct. 1123, 1127, 94 L.Ed.2d 307 (1987) (hospitalization is "a fact more than sufficient to establish that one or more ... major life activities were substantially limited by [the] impairment"). In sum, even absent the government's stipulation, this Court would find that plaintiff, as a CFIDS sufferer, is handicapped within the meaning of the Act.

sense conclusion.[18] But this authority does not establish any specific attendance requirements for government or non-government jobs. Instead, the necessary level of attendance and regularity is a question of degree depending on the circumstances of each position. *See* 29 C.F.R. § 1613.702(f) (referring to the "position in question"); *see also School Board of Nassau County, Fla. v. Arline*, 480 U.S. at 287–88, 107 S.Ct. at 1130–31 (determination of whether plaintiff is "otherwise qualified" requires individualized inquiry and findings of fact). What is clear, however, is that some degree of regular, predictable attendance is fundamental to most jobs.

The case at bar is no exception. Convincing trial testimony establishes that plaintiff was part of a five-person team in an office operating under stringent statutory deadlines and subject to a significant backlog of work. In these circumstances, there can be no doubt that substantial and unpredictable absenteeism would preclude plaintiff from performing her essential job duties. Put another way, her job clearly required reasonably regular, predictable attendance.[19] Equally clear from the trial record is that plaintiff's absenteeism precluded her from performing her duties at a satisfactory productivity level. Plaintiff missed more than four weeks per year, over and above her full annual and sick leave. Indeed, during the first half of 1989, she was absent for part or all of more than 60 days at an annualized rate, excluding the period of hospitalization. Moreover, plaintiff's absenteeism was essentially random; only her hospital stay and perhaps some medical appointments were scheduled. Apart from these, however, plaintiff's supervisors could not count on her attendance or predict her absences. In these circumstances, plaintiff could not effectively perform her job functions.[20]

**18.** *See, e.g., Law v. USPS*, 852 F.2d 1278, 1279–80 (Fed.Cir.1988) ("an agency is inherently entitled to require an employee to be present during scheduled work times and, unless the agency is notified in advance, an employee's absence is disruptive to the agency's efficient operation"); *Santiago v. Temple University*, 739 F.Supp. 974, 979 (E.D.Pa.1990) ("An employee of any status, full or part time, cannot be qualified for his position if he is unable to attend the workplace to perform the required duties, because attendance is necessarily the fundamental prerequisite to job qualification"); *Lemere v. Burnley*, 683 F.Supp. 275, 280 (D.D.C.1988) (alcoholic federal employee lost status of qualified handicapped person through pattern of unscheduled absences); *Matzo v. Postmaster General*, 685 F.Supp. 260 (suggesting that ability to report for work and stay on duty is a basic job qualification and granting summary judgment against manic-depressive postal worker frequently AWOL); *Wimbley v. Bolger*, 642 F.Supp. 481, 485 (W.D. Tenn.1986) ("It is elemental that one who does not come to work cannot perform *any* of his job functions, essential or otherwise."), *aff'd*, 831 F.2d 298 (6th Cir.1987) (table affirmance) (emphasis in original).

**19.** Plaintiff, seeking to avoid this conclusion, notes that because her official position description makes no mention of regular attendance, it therefore cannot be an essential job function. In support she cites, e.g., *Guinn v. Bolger*, 598 F.Supp. 196 (D.D.C.1984). The argument is unpersuasive and the reliance on *Guinn* misplaced. The clear weight of the persuasive trial testimony establishes that while plaintiff could rationalize or explain away several of the alleged effects her condition had on the performance of the Branch, her absenteeism was undeniably disruptive to the office and caused her to fall behind in comparison to others. In other words, reasonably regular and predictable attendance was an implicit job requirement for plaintiff, as it is for many. Its omission from the official position description is immaterial. Nor is *Guinn* to the contrary; it merely held that the Postal Service could not rely on "business necessity" as a reason for releasing an employee on light duty where the employee's official job description specified full duty. The *Guinn* court held that the Postal Service was bound by the official job description and could not avoid it. Unlike the Postal Service, the Navy here does not seek to avoid the official job description. Rather, it argues on the basis of convincing trial testimony that reasonably regular attendance, while not specifically listed as a job function, is implicitly essential in order to perform the listed functions at a satisfactory productivity level.

**20.** Plaintiff argues that Wright conceded that plaintiff, notwithstanding her absenteeism, adequately performed the essential functions of her position. Plaintiff relies on the following exchange with supervisor Wright:

THE COURT: Well, but take her job as a whole, counting when she was there and when she wasn't there. In other words, all of her essential job functions for the period covered in this evaluation, she finished them in a manner that is accurately characterized by the phrase "exceeds fully successful." Is that right?

While it is implausible to suggest, as Wise did, that the Branch's volume of work required plaintiff's perfect attendance, the greater weight of persuasive trial testimony established that regular, full-time work with a low rate of absenteeism was essential to the success of the Branch. *Cf. Wimbley v. Bolger*, 642 F.Supp. at 485 ("If the agency is to meet its statutory mandate ... it must have employees who can be counted on to come to work on a regular basis."); *compare Law v. USPS* (upholding termination where postal worker, over twelve month period, had seven instances of tardiness, one day of emergency annual leave, nineteen days of sick leave, and a small amount of AWOL).

Plaintiff advances several arguments in support of her contention that regular attendance was not an essential function of her position. First, she argues that convincing evidence of her satisfactory job performance despite her absenteeism is provided by her receipt of high performance ratings, positive evaluations (some of which covered duties that incorporated accuracy and timeliness requirements), and a performance award issued after the Navy had proposed her removal. This evidence is especially persuasive, she contends, because the evaluations and award were contemporaneous and hence serve to refute the Navy's *post hoc* claims concerning the effects of her absences. This argument is unconvincing. The Navy's claims concerning the effects of her absences are not *post hoc* rationalizations. The contemporaneous record is not silent on her excessive absenteeism. On the contrary, it reveals that throughout much of her tenure at NAVSEA plaintiff was subject to letters of requirement or leave restriction.[21] These letters demonstrate her supervisors' concern regarding her absenteeism and the existence of an impact on office productivity. Nor is this concern about plaintiff's absenteeism inconsistent with her favorable work evaluations. Wise and Wright also testified that their evaluations of plaintiff were constrained by Navy forms and practices, the effect of which was (i) that plaintiff's evaluations concerned only the quality of her work, not her attendance or productivity, and (ii) that these evaluations, contrary appearances notwithstanding, were in fact almost the lowest that could be given without extensive documentation that was unavailable at that time.[22] Wise and Wright also testified that his or her evaluations were somewhat inflated for the purpose of providing plaintiff with encouragement. The Court also accepts Tittle's testimony that despite the lag time in its issuance, plaintiff's performance award covered the pre-April 1989 period and therefore took no account of her worsening attendance problems following the period of hospitalization.

Next, plaintiff argues that the fact that her position was not filled for months after

THE WITNESS: Yes, sir.
Plaintiff's argument is meritless; her reliance on the single cited question and answer is out of context and unjustified. Taken as a whole, Wright's testimony concedes only that plaintiff's work was satisfactory *when plaintiff was at work*. Among the transcript excerpts confirming this are:
THE COURT: Well, at the time that this was filled out, 5(b), I take it that notwithstanding whatever attendance problems she was having, she was *exceeding fully successful* in her job. Isn't that right?
THE WITNESS: When she was there, yes, sir.
THE COURT: Well, altogether she was succeeding fully successful; counting the times that she was there and the time that she wasn't there, she was getting the job done in a way that is accurately characterized as exceeding fully successful. Is that right?
THE WITNESS: That's right; when she was there, sir.

21. More specifically, the record reflects that plaintiff was issued: 1) a Letter of Requirement (Leave) dated December 4, 1985; 2) a Letter of Caution and Supplemental Attendance Requirements dated July 17, 1986; 3) a Letter of Requirement dated June 30, 1988 and issued by the supervisor who preceeded Wise; and 4) a Letter of Requirement issued by Wise on January 6, 1989.

22. At trial, the Court expressed concern that NAVSEA's rating and evaluation forms took no account of employee productivity and that agency rules made negative evaluations a rarity. In doing so, however, the Court did not intend to suggest any doubt regarding the credibility of the witnesses' testimony. Indeed, Wise agreed with the Court's remarks and expressed dissatisfaction with some of NAVSEA's personnel evaluation practices and forms.

her departure undermines the Navy's claim that reasonably regular and predictable attendance was essential. The record refutes this argument. The testimony made clear that despite the needs of the Branch, plaintiff's supervisors were unable to obtain additional positions from the command; after plaintiff's termination NAVSEA was subject to a hiring freeze, which prevented filling plaintiff's position. Moreover, the Branch was reorganized, eliminating plaintiff's position. Given these facts, the failure to fill plaintiff's position quickly does not refute the conclusion reached here that plaintiff's handicap caused her to have a high level of unpredictable absenteeism and thus prevented her from performing the essential functions of her job at a satisfactory level of productivity. The remaining question is whether there exists any reasonable accommodation that the Navy could make that would enable plaintiff to perform her job satisfactorily notwithstanding her handicap and its effects.

## 2. Reasonable Accommodation

■ Federal agencies have a duty "to make reasonable accommodation to the known physical or mental limitations of a qualified handicapped ... employee" unless the agency demonstrates that to do so would "impose an undue hardship" on the operation of its program. 29 C.F.R.

§ 1613.704(a). But at the outset, it is plaintiff who has the burden of showing that she is a "qualified handicapped employee." Thus, plaintiff bears the burden of demonstrating that she could perform the essential functions of her job with reasonable accommodation. *See Lucero v. Hart*, 915 F.2d 1367, 1371 (9th Cir.1990); *Prewitt v. U.S. Postal Service*, 662 F.2d at 309–10; *Langon v. U.S. Dept. of Health and Human Services*, 749 F.Supp. at 4. She has not carried this burden. Plaintiff's only direct evidence of her capability is her own assessment of her health, namely that in recent months she has been feeling well. Dr. Hallowitz also stated that he believed plaintiff could work for forty hours per week, but conceded that the principal basis for this belief was plaintiff's self-assessment. This is unwarranted optimism, for arrayed against plaintiff's belief is a four-year history of work attendance that shows a consistently high rate of absenteeism. Moreover, during the course of her tenure the Navy provided plaintiff with various combinations of leave and restrictions,[23] none of which proved effective. Regardless of the nature of her regime, plaintiff was absent from work for more than two months per year, including sick and annual leave. This history compels the conclusion that plaintiff, given her handicap, is simply

---

**23.** Although the Navy was slow to acknowledge plaintiff's handicapped status, the record reflects nonetheless that several efforts were made to accommodate plaintiff's situation. Specifically, the Navy permitted plaintiff to utilize a combination of sick, annual, and donated leave in order to attempt to ameliorate her condition by means of a substantial period of hospitalization. The Navy also extended the hospitalization period by two weeks at the request of plaintiff's physician. Beyond this, Wise testified that she permitted plaintiff to arrive late at work and stay late when plaintiff's condition so demanded. Wise also permitted plaintiff to take her lunch hour at the end of the day in order to leave early for medical appointments. The record further reflects that at times plaintiff was permitted to (i) use annual leave to cover sick absences, (ii) accrue compensatory time for future absences by working weekends or compressed days off, and (iii) utilize donated leave. Finally, plaintiff's supervisors explored the possibility of other positions to which plaintiff might be better suited. This they were not

required to do. *See Carter v. Tisch*, 822 F.2d 465, 467 (4th Cir.1987) (federal agency is not obligated to transfer employee in order to provide work the employee can perform); *Wimbley v. Bolger*, 642 F.Supp. at 486. The reasonableness of the Navy's accommodation efforts should be viewed in light of the fact that prior to July 1989 plaintiff's supervisors were given only conclusory statements regarding plaintiff's medical problems rather than a detailed explanation of her handicapping condition. *See* 29 C.F.R. § 1613.704(a) ("An agency shall make reasonable accommodation to the *known* physical or mental limitations" of a qualified handicapped employee); *cf. Langon v. U.S. Dept. of Health and Human Services*, 749 F.Supp. at 6 (where plaintiff failed to provide defendant with detailed medical information, refused a fitness for duty examination, and relied instead on cursory descriptions of her illness, her claim that the agency's attempts to accommodate did not adequately address her condition were unpersuasive).

not suited for this particular position.[24]

Nor is the Court persuaded by the indirect evidence of the accommodation provided to Katherine Jorden, a CFIDS victim employed as a secretary at the Naval Surface Warfare Center. Jorden testified that the Navy gives her leave without pay, advances her sick leave, permits her to participate in the leave transfer program and Flexitour (i.e., she may arrive at work early and leave early, or arrive late and stay late), permits her to work weekends and compressed days-off when she is able, and does not discipline her (e.g., by charging her with AWOL) for her absences. She testified that while her illness forces her to use large amounts of leave, she is able to meet deadlines and has received positive evaluations. By comparison to plaintiff's position, however, Jorden's situation is inapposite. Jorden serves as a secretary; she testified that her principal duties are typing correspondence and the processing of stub requisitions, travel vouchers, and the like. While these responsibilities may involve some time deadlines, they are not comparable to the statutory deadlines and substantial press of business in the NAVSEA FOIA branch. More importantly, Jorden testified that when she misses work, other secretaries either fill her post or assume her work by means of a common computer network. By contrast, plaintiff testified that when she was absent, no one else was willing or able to take her place. The work was either assigned to other employees or simply accumulated on her desk.

Plaintiff argues that the appropriate accommodation for her is essentially that provided to Jorden. This would include, *inter alia*, (i) removal of leave restrictions and discipline, (ii) permitting plaintiff to utilize donated leave and granting her leave without pay; (iii) permitting plaintiff to take unscheduled leave when needed, (iv) permitting plaintiff to use compensatory time before it is earned, and (v) permitting plaintiff to make up for her absences after, as well as before, they occur. In essence, the accommodation plaintiff seeks is simply to be allowed to work only when her illness permits.[25] In seeking this proposed accommodation plaintiff asks for more than the law requires; she asks for accommodation that, the record shows, would result in an undue hardship to the Branch.[26] Significant in this respect is that the Branch is a small group—fewer than fifteen employees—required to work under certain time deadlines and budget constraints. In these circumstances, it is unmistakably clear that

---

24. Plaintiff suggests that she has never had a truly representative work period with NAVSEA because she has been subjected to disciplinary measures, which in turn caused plaintiff to suffer stress, a factor known to exacerbate CFIDS. This, too, is not convincing. No doubt there is some degree of stress associated with the normal press of business in plaintiff's job. Another source of stress for plaintiff may have been disciplinary measures directed at her. Yet there is no persuasive evidence that any particular type or amount of discipline caused stress that worsened plaintiff's condition. Dr. Hallowitz at best speculated that plaintiff might have been affected by stress. He also admitted that CFIDS-aggravating stress may be caused by non work-related everyday activities as much as by job-related requirements. There is no persuasive evidence that the elimination of disciplinary measures relating to absenteeism would reduce plaintiff's work-related stress to the point that she would be able to achieve regular attendance and adequate job productivity.

25. Jorden made clear the dilemma faced by plaintiff when she testified that because of her illness her job essentially amounts to "I just work when I can." The fact that Jorden's superiors permit her this schedule shows exemplary tolerance and understanding on their part. Such an arrangement also invites the inference, however, that Jorden is not needed at work on a regular basis. And as explained above, the law requires the government to provide only reasonable, not extraordinary, accommodation.

26. 29 C.F.R. § 1613.704(c) provides that in determining whether an accommodation would impose an undue hardship, the factors to be considered include: "(1) the overall size of the agency's program with respect to the number of employees, number and type of facilities and size of budget, (2) the type of agency operation, including the composition and structure of the agency's work force, and (3) the nature and cost of the accommodation." In this case, these factors point persuasively toward a finding of undue hardship. *Cf. Dexler v. Tisch*, 660 F.Supp. 1418, 1428 (D.Conn.1987) (small post office that processed large quantity of mail according to strict scheduling deadlines could not tolerate handicapped employee whose work efficiency would be "substantially lower than that of an average ... clerk").

each member of this Branch must be prepared to pull his or her full weight. *Cf. Wimbley v. Bolger,* 642 F.Supp. at 485 (noting that postal service is not "a welfare agency" that could "simply allow plaintiff to come and go as he pleased"). Plaintiff cannot expect the Navy to require other employees to substitute for her during her frequent and unpredictable absences. *See Dexler v. Tisch,* 660 F.Supp. 1418, 1427–29 (D.Conn.1987) (not assigning normal tasks to handicapped employee, doubling up on tasks, or measures that would cause significant loss of office efficiency may constitute undue hardship); *Bey v. Bolger,* 540 F.Supp. 910, 927 (E.D.Pa.1982) (Postal Service not required to adopt accommodation that would reduce efficiency to an unacceptable level).

In sum, the Court is satisfied that the government has successfully borne its burden of demonstrating that plaintiff's proposed accommodation would impose an undue hardship on the Branch. Beyond this, there is no persuasive evidence that the accommodation plaintiff seeks would do anything other than excuse her non-performance. The requested leave adjustments and removal of discipline might well result in plaintiff having an improved leave balance, but aside from contributing to a possible reduction in stress, these measures offer no real prospect that plaintiff would be able to achieve reasonably regular and predictable work attendance.

Plaintiff also argues that 29 C.F.R. § 1613.704(b) defines "reasonable accommodation" to include "job restructuring, part-time or modified work schedules", but the Navy never offered her these options. This claim is also unpersuasive. First, as explained above plaintiff was in fact permitted to modify her work schedule to some extent (e.g., arrive and leave late, work weekends for compensatory time), but the modifications did not improve her attendance. Second, part-time work was not a realistic option; plaintiff occupied a full-time billet in an office that was understaffed and already included one part-time employee on the team. Finally, each of the options in § 1613.704(b) implies some type of schedule or regularity. *Cf. Wimbley v.*

*Bolger,* 642 F.Supp. at 486 ("[E]ven a part-time employee would still have a fixed schedule. That is, he would still be required to report on given days and hours."). The problem here is that both plaintiff's handicap and her requested accommodation demand irregularity. In *Wimbley,* the court considered the predicament of a postal service employee whose mental condition caused frequent, unscheduled absences. The court explained that placing the employee in a part-time position would not solve the problem of absenteeism precisely because the employee's handicap prevented him from maintaining a fixed schedule. *See id.* The same conclusion applies to a modified work schedule: if plaintiff's claim that she cannot give advance notice as to when she will be absent is true, no schedule will enable her to maintain regular attendance.

Because plaintiff did not show that she could perform the essential functions of her position, even with reasonable accommodation, plaintiff has not demonstrated that she was an "otherwise qualified handicapped individual" for the purpose of establishing a prima facie case of handicap discrimination. For the same reasons, she has not shown that she was discharged solely because of her handicap. Defendant is therefore entitled to judgment.

An appropriate order shall issue.